UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

YEKATRINA PUSEPA,

                        Plaintiff

            - against -

ANTHONY J. ANNUCCI, Acting
Commissioner of the New York State
Department of Corrections and Community
Supervision;
JASON EFFMAN, Associate Commissioner
and PREA Coordinator for New York State
Department of Corrections and Community
Supervision;
A. RODRIGUEZ, Acting Director, Special
Housing and For New York State
Department of Corrections and Community
Supervision;
SABINA KAPLAN, Superintendent of
Bedford Hills Correctional Facility;
RUBEN ILLA, Correctional Officer at
Bedford Hills Correctional Facility;
M. ALI, Correctional Officer at
Bedford Hills Correctional Facility;
P. ARTUZ, Correctional Officer at
Bedford Hills Correctional Facility;
MICHAEL DAYE, Correctional Officer at
Bedford Hills Correctional Facility;
FNU SPEIGHTS, Correctional Officer at
Bedford Hills Correctional Facility;
FNU FUSCO, Correctional Officer at
Bedford Hills Correctional Facility;
FNU DUKES, Correctional Officer at
Bedford Hills Correctional Facility;
FNU MOSS, Correctional Officer at
Bedford Hills Correctional Facility;
DUSTIN RUBAINE, Investigator at New
York State Department of Corrections and
Community Supervision, Office of Special
Investigations;
CHRISTOPHER NUNEZ, Investigator at

17-civ.-_____

COMPLAINT

<u>Jury Trial Demanded</u>

1

New York State Department of Corrections and Community Supervision, Office of Special Investigations;
**STEVEN BROOMER**; Investigator at New York State Department of Corrections and Community Supervision, Office of Special Investigations;
**JOHN DOEs #1-6**, Correctional Officers at Bedford Hills Correctional Facility, in their individual and official capacities; and
**JANE DOEs #1-2**, Correctional Officers at Bedford Hills Correctional Facility, in their individual and official capacities,

DEFENDANTS.

--------------------------------------------------------------------X

Plaintiff **YEKATRINA PUSEPA**, by and through her attorneys,

Perlmutter & McGuinness, P.C. and the Law Office of Zachary Margulis-

Ohnuma, as and for her complaint, hereby alleges as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought under 41 U.S.C. § 1983 and New York common law against both a corrections officer, who violated Plaintiff **YEKATRINA PUSEPA**'s civil rights by engaging in unlawful sexual activity with her, and against prison officials, who not only intentionally allowed the conduct to occur, but thereafter punished plaintiff by wrongfully committing her to solitary confinement for eight months and permitting another inmate to brutally attack her. The sexual contact occurred in or about April 2015, when defendant **RUBEN ILLA,** a correctional officer working at Bedford Hills Correctional Facility (hereinafter

"BHCF"), sexually assaulted Plaintiff at BHCF, in Bedford Hills, New York by engaging in sexual touching with Plaintiff to which she could not give legal consent.

2. BHCF investigators were aware that Plaintiff was vulnerable to abuse by **C.O. ILLA** but allowed him to have access to her, including in her housing unit. In effect, in a misguided effort to catch **C.O. Illa** in the act, prison officials held Plaintiff out as bait without her consent and with deliberate indifference to her safety.

3. On December 10, 2015, investigators interviewed Plaintiff about her contact with **C.O. Illa**. She declined to answer questions. When she did not cooperate, Defendants unlawfully placed her in "administrative segregation" under the pretext of an alleged escape conspiracy that was wholly fabricated. Altogether, she spent approximately eight months in solitary confinement, locked down in her cell for 23 hours a day and denied access to basic privileges afforded other inmates.

4. While in segregation, Plaintiff warned guards that she was being threatened by another inmate with a history of violence. As detailed below, corrections officers nonetheless deliberately or recklessly gave that other inmate access to her. Plaintiff was attacked by the other inmate, who caused injuries to her face, neck and head.

5. This lawsuit seeks compensatory and punitive damages for the harms caused by Defendants' conduct in using Plaintiff as human bait, sexually assaulting her, unlawfully placing her in solitary confinement, and allowing her to be beaten by another inmate they knew to be violently threatening her.

## JURISDICTION

6.      Subject matter jurisdiction over the federal constitutional issues is proper in this Court pursuant to 28 U.S.C. § 1331.  Plaintiff also invokes the Court's supplemental jurisdiction under 28 U.S.C. § 1367 over any and all state law claims and causes of action, which derive from a common nucleus of operative facts and are part of the same case or controversy that gives rise to the federal claims and causes of action.  This Court has jurisdiction to order nominal, compensatory and punitive damages, attorneys' fees, and injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. §§ 1983 and 1988.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred inside the Bedford Hills Correctional Facility located in the Southern District of New York.

## PARTIES

8.      Plaintiff **YEKATRINA PUSEPA**, is a female inmate at BHCF under the operation and control of New York State Department of Corrections and Community Supervision (hereinafter "DOCCS").

9.      Defendant **ANTHONY J. ANNUCCI** (hereinafter "**COMM. ANNUCCI**") is the Acting Commissioner of DOCCS, which was formerly known as the New York Department of Correctional Services.  **COMM. ANNUCCI** is sued herein solely in his official capacity.

10. Defendant **JASON EFFMAN** (hereinafter "**COORD. EFFMAN**") was at all relevant times Associate Commissioner of and Prison Rape Elimination Act (hereinafter "PREA") Coordinator for DOCCS. The United States Department of Justice ("DOJ") regulation at 28 C.F.R. § 115.11(b) requires an agency to employ or designate an upper-level, agency-wide PREA coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with PREA standards in all its facilities. Upon information and belief, **COORD. EFFMAN** was at all relevant times the individual charged with these responsibilities for DOCCS. **COORD. EFFMAN** is sued in his official capacity.

11. Defendant **A. RODRIGUEZ** (hereinafter "**DIR. RODRIGUEZ**") was at all relevant times Acting Director of Special Housing for DOCCS. **DIR. RODRIGUEZ** is being sued in his individual and official capacity.

12. Defendant **SABINA KAPLAN** (hereinafter "**SUPT. KAPLAN**") was at all relevant times the superintendent of BHCF. Superintendent **SABINA KAPLAN** is being sued in her individual and official capacity.

13. Defendants **P. ARTUZ** (hereinafter "**CAPT. ARTUZ**") and **MICHAEL DAYE** (hereinafter "**CAPT. DAYE**") were at all relevant times correctional officers at BHCF, and had the rank of captain. They are being sued in their individual and official capacities.

14. Defendants **FNU FUSCO** (hereinafter "**SGT. FUSCO**") was at all relevant times a correctional officer at BHCF, and had the rank of sergeant. He is being sued in his individual and official capacity.

5

15. Defendants **RUBEN ILLA** (hereinafter "**C.O. ILLA**") and **M. ALI** (hereinafter "**C.O. ALI**") were at all relevant times correctional officers at BHCF. They are being sued in their individual and official capacities.

16. Defendants **FNU MOSS** (hereinafter **"C.O. MOSS"**) and **FNU DUKES** (hereinafter **"C.O. DUKES"**) were at all relevant times correctional officers at BHCF. They are being sued in their individual and official capacities.

17. Defendant **FNU SPEIGHTS** (hereinafter "**SGT. SPEIGHTS**") was at all relevant times a correctional officer at BHCF, and had the rank of sergeant. She is being sued in her individual and official capacity.

18. Defendants **CHRISTOPHER NUNEZ** (hereinafter **"INV. NUNEZ"**); **DUSTIN RUBAINE** (hereinafter "**INV. RUBAINE**") and **STEVEN BROOMER** (hereinafter "**INV. BROOMER**") were at all relevant times investigators for DOCCS Office of Special Investigations (hereinafter "OSI"). They are being sued in their individual and official capacities.

19. **JOHN DOEs #1-6** (hereinafter "**C.O. DOEs #1-6**") and **JANE DOEs #1-2** (hereinafter "**C.O. JANE DOEs #1-2**") are pseudonyms for unidentified correctional officers at BHCF. They are being sued in their individual and official capacities.

## FACTUAL ALLEGATIONS

### I.  The Illicit Relationship

20.  From approximately January 2014 to approximately April 2015, Plaintiff was housed in Unit 120B at BHCF.

21.  Plaintiff met **C.O. ILLA** in September of 2014.  By November of 2014 **C.O. ILLA** and Plaintiff were frequently passing notes of a sexual nature.

22.  **C.O. ILLA's** duty was to escort inmates to and from the medical station.  **C.O. ILLA** would loiter in the recreation yard when not performing his duty for the purpose of congregating with Plaintiff.  **C.O. ILLA** would put his arm around Plaintiff's waist and hold her hand.

23.  **C.O. ILLA** swapped shifts with another correctional officer to work at Unit 120B for the purpose of spending more time with Plaintiff.

24.  Certain areas in the recreation yard were known to BHCF's staff and inmates to be unobserved and not visible by any camera.  Plaintiff and **C.O. ILLA** often met in the recreation yard in these areas.

25.  In exchange for the relationship Plaintiff had with **C.O. ILLA, C.O. ILLA** gave Plaintiff privileges, including, allowing Plaintiff to smoke cigarettes, give tattoos, and be out of place.

26.  In approximately April of 2015, **C.O. ILLA** asked Plaintiff to get in the shower and let **C.O. ILLA** see Plaintiff naked.  Plaintiff refused.

27. A short time later, **C.O. ILLA** and Plaintiff arranged for **C.O. ILLA** to come to Plaintiff's cube in private.

28. Unit 120B at BHCF is a dorm that is separated into 50 small cubes. 25 cubes have two inmates housed in them and 25 cubes have single occupancy.

29. Plaintiff was housed in a double-occupancy cube.

30. Two other inmates held a curtain to hide **C.O. ILLA** and Plaintiff from view. **C.O. ILLA** touched Plaintiff's naked body including her waist and vagina.

31. In approximately May 2015, Plaintiff was transferred to Building 114.

32. Upon information and belief, **C.O. ILLA** swapped shifts to work in Building 114 for the purpose of spending more time with Plaintiff.

33. In approximately August 2015, Plaintiff and **C.O. ILLA** arranged to be alone in a storage room for the purpose of having intercourse. Another inmate stood watch to ensure they would not be discovered. **C.O. ILLA** became frightened and left the doorway of the storage room before having intercourse with Plaintiff. Plaintiff was only in the storage unit for a few minutes.

## II. The Sham Hearing and SHU Confinement.

34. On December 2, 2015, Plaintiff was told she had a medical appointment by a correctional officer on her unit. Plaintiff was not aware of any scheduled medical visit but assumed it was a routine check. Plaintiff reported to the clinic.

35. **C.O. ILLA** met with Plaintiff in the clinic waiting area and spoke with her.

8

36. Upon information and belief, **C.O. ILLA** called for Plaintiff to be produced to the medical clinic solely so that **C.O. ILLA** could spend time with Plaintiff.

37. Approximately 20 minutes later, **SGT. FUSCO** and two other correctional officers entered the clinic waiting area, pulled Plaintiff out of the area and conducted a pat-frisk search on Plaintiff. Nothing was recovered from the search.

38. **SGT. FUSCO** told Plaintiff, "Stay away from my officers."

39. Upon information and belief, **SGT. FUSCO** made this statement as a recrimination against Plaintiff for the improper relationship that **C.O. ILLA** had cultivated with her.

40. Plaintiff was then walked back to her cell where she waited for approximately three hours.

41. Plaintiff was then escorted to the interview building and placed in a supply closet for approximately seven hours. The supply closet was an approximately six-foot-by-six-foot, cold, windowless room.

42. Plaintiff was then placed in a room and questioned by **INV. RUBAINE**. **INV. RUBAINE** stated to Plaintiff that **INV. RUBAINE** knew about the relationship between **C.O. ILLA** and Plaintiff. **INV. RUBAINE** told Plaintiff that he would "make her time harder" if Plaintiff did not answer him.

43. Plaintiff refused to answer questions about the relationship between **C.O. ILLA** and Plaintiff. As soon as Plaintiff refused to cooperate, **INV. RUBAINE**

9

said, "good luck" and Plaintiff was escorted to the Special Housing Unit (hereinafter "SHU").

44. The SHU is a segregated area of the facility where inmates are held in isolation for 23 hours per day. While in SHU, among other restrictions, Plaintiff was not allowed access to her belongings, permitted to shower only three times per week, and lost her phone privileges.

45. Plaintiff was held in SHU pending a hearing.

46. Plaintiff has since been told that **C.O. ILLA** was found with a handcuff key.

47. On December 4, 2015, **CAPT. ARTUZ** recommended that Plaintiff be confined to administrative segregation. **CAPT. ARTUZ** alleged that a confidential letter, the finding of a cuff key, and results from a confidential investigation supported a finding that Plaintiff had "conspired to escape" from BHCF.

48. In reality, **CAPT. ARTUZ** knew that Plaintiff was not aware of any plan, conspiracy or attempt to escape from BHCF.

49. **C.O. ILLA** filed a false statement charging Plaintiff with being "out of place" when in fact **C.O. ILLA** himself summoned Plaintiff to medical. **C.O. ILLA** filed this false report to cover up his relationship with Plaintiff.

50. **C.O. ILLA's** complaint was known by prison officials and OSI investigators to be false, and was not a part of the administrative segregation hearing that followed.

10

51.     Upon information and belief, **C.O. ILLA** has since been arrested for and pled guilty to offering a false instrument for filing in the first degree (NYPL § 175.35 (2014) because of the false report he filed against Plaintiff.  He is still awaiting sentence.

52.     An administrative segregation hearing, conducted by **CAPT. DAYE**, commenced at Bedford Hills on December 10, 2015.  Plaintiff pleaded not guilty to the charge of conspiracy to escape.

53.     **CAPT. ARTUZ** was the first witness called at Plaintiff's hearing.  He refused to disclose any information whatsoever about the confidential letter or the confidential investigation that formed the basis of the charge.  **CAPT. ARTUZ** did disclose, however, that the cuff key was not found among Plaintiff's property and was never alleged to have been in her possession.

54.     **CAPT. DAYE** told Plaintiff he would obtain confidential testimony and then disclose to Plaintiff what he could.  **CAPT. DAYE** also said Plaintiff could write down questions that he would ask on Plaintiff's behalf outside of Plaintiff's presence.  Plaintiff wrote questions to be asked by **CAPT. DAYE**.

55.     When the hearing resumed, **CAPT. DAYE** told Plaintiff that he had posed Plaintiff's questions to **CAPT. ARTUZ**, but that the answers would remain confidential.

56.     **CAPT. DAYE** informed Plaintiff that **CAPT. ARTUZ** admitted that the cuff key was never in Plaintiff's possession, and that **CAPT. ARTUZ** was unaware if Plaintiff even knew about the cuff key.

11

57. **INV. RUBAINE** also offered testimony against Plaintiff at the hearing. Plaintiff posed questions to **INV. RUBAINE** but **CAPT. DAYE** deemed the answers confidential and did not disclose the answers to Plaintiff.

58. **INV. RUBAINE** also testified on the non-confidential record. **INV. RUBAINE** hinted at evidence that Plaintiff might have had knowledge of the cuff key, but refused to provide any further information or answer any of Plaintiff's questions about her alleged conspiracy to escape.

59. The only substantive testimony by **INV. RUBAINE** was that to his knowledge, the confidential letter was not written by Plaintiff. **INV. RUBAINE** also stated that other letters were found in Plaintiff's Bible in her cell.

60. Plaintiff is familiar with the letters found inside her Bible. They contained no information related to any escape plans, conspiracy or attempt. The personal letters were not correspondences with **C.O. ILLA**.

61. Plaintiff testified that the allegations against her were completely surprising to her. Plaintiff testified that conspiracy requires involvement with another person, but she did not know anyone planning or facilitating an escape. Plaintiff also emphasized that she had no reason to jeopardize her sentence as her conditional release date is in 2019.

62. At the end of the hearing Plaintiff made several objections. Plaintiff objected to the failure to provide her with documentary evidence and the fact Plaintiff was unable to hear the contents of the confidential letter, which prevented her from disputing the allegations against her.

63. Petitioner further objected to the lack of evidence of her knowledge of the cuff key, and wanted to know what evidence was relied upon to support she was in agreement with someone to escape.

64. The hearing concluded on January 5, 2016. In his hearing determination, **CAPT. DAYE** issued a disposition in favor of the administrative segregation recommendation, which stated "admit to admin seg." Evidence **CAPT. DAYE** relied upon included the recommendation of **CAPT. ARTUZ**, both the confidential and non-confidential testimony of **CAPT. ARTUZ** and **INV. RUBAINE**, the confidential letter, and Plaintiff's testimony.

65. Administrative segregation is indefinite SHU confinement. In this case, the challenged disposition could have kept Plaintiff in punitive isolation until the maximum expiration date of her sentence, which on information and belief is November 5, 2020.

### III. Coercive Continued SHU Confinement

66. On January 7, 2016, Plaintiff submitted an administrative appeal in which Plaintiff argued that the lack of documentary evidence prevented her from disputing the evidence against her; the failure to provide Plaintiff with adequate notice impaired her ability to defend herself; and that no proof of her alleged conspiracy to escape existed.

67. In or about February of 2016, **INV. RUBAINE** visited Plaintiff in the SHU, and told her that if she cooperated with the investigation, he would help her get out of SHU. Plaintiff declined to cooperate with the investigation.

13

68. On March 3, 2016, **DIR. RODRIGUEZ**, reviewed and affirmed the hearing disposition.

69. In or about March of 2016, **INV. RUBAINE** again visited Plaintiff in the SHU. **INV. RUBAINE** asked Plaintiff to cooperate with the investigation, and told Plaintiff that **INV. RUBAINE** and others knew of the relationship between **C.O. ILLA** and Plaintiff since January 2015.

70. Upon information and belief, from approximately January 2015 until December 2015, **INV. RUBAINE** and others allowed **C.O. ILLA** access to Plaintiff in the hopes that they would catch them engaged in improper activity. Plaintiff was essentially used as bait in their investigation.

71. Later in or about March of 2016, **INV. NUNEZ** visited Plaintiff in the SHU. **INV. NUNEZ** told Plaintiff that if Plaintiff cooperated and wrote out a statement he would help her get out of SHU.

72. Desperate to get out of SHU, Plaintiff agreed to write a statement, but attempted to protect **C.O. ILLA** and did not include the sexual contact.

73. In or about April of 2016, **INV. RUBAINE** again visited Plaintiff in SHU. **INV. RUBAINE** sought a more detailed and full statement from Plaintiff. **INV. RUBAINE** told her that the SHU confinement was now "over his head" but he would talk to someone to see what he could do, if she wrote out a more detailed statement.

74. **INV. RUBAINE** also told Plaintiff that **C.O. ILLA** was getting married and having a baby.

14

75. On or about April 13, 2016, **SUPT. KAPLAN** wrote Plaintiff stating that **SUPT. KAPLAN** had performed a 60-day review of Plaintiff's administrative segregation, and that Plaintiff would remain in administrative segregation.

76. In or about May of 2016, **INV. RUBAINE** again visited Plaintiff in the SHU. Plaintiff gave a more detailed statement but still did not include the sexual contact to protect **C.O. ILLA**.

77. On May 23, 2016, Plaintiff filed an Article 78 action challenging the legality of her administrative segregation in New York Supreme Court, Albany County, Index No. 2505/2016.

78. On or about June 10, 2016, **INV. RUBAINE** along with **INV. BROOMER** visited Plaintiff in SHU. **INV. RUBAINE** and **INV. BROOMER** interviewed Plaintiff about **C.O. ILLA**. **INV. BROOMER** stated that if Plaintiff agreed to testify against **C.O. ILLA**, **INV. BROOMER** would help her to be transferred out of SHU.

79. At that meeting, Plaintiff wrote a full written statement including the details of the sexual contact and gave it to **INV. BROOMER** and **INV. RUBAINE**.

80. The statement was approximately 11 hand-written pages.

81. On or about July 5, 2016, **INV. RUBAINE** visited Plaintiff in SHU and told her that he had spoken to **SUPT. KAPLAN** and that it was time for her to be released. Plaintiff was then transferred out of SHU.

82. Plaintiff later received a letter from **DIR. RODRIGUEZ** that the hearing determination had been administratively reversed on July 5, 2016.

15

83. Upon information and belief, **SUPT. KAPLAN, CAPT. ARTUZ, CAPT. DAYE, INV. BROOMER, INV. NUNES**, and **INV. RUBAINE.** knew that evidence did not exist to conclude that Plaintiff knew of any plan, conspiracy or attempt to escape from BHCF, nor did they have reason to belief that Plaintiff knew of any plan, conspiracy or attempt of **C.O. ILLA** to facilitate an escape.

84. No reasonable basis existed to sentence Plaintiff to administrative segregation, or continue her confinement therein.

85. Plaintiff exercised her Fifth Amendment Right to silence in her refusal to cooperate with the investigation of **C.O. ILLA**.

86. Upon information and belief, **SUPT. KAPLAN, CAPT. ARTUZ, CAPT. DAYE, INV. BROOMER, INV. NUNES**, and **INV. RUBAINE**, conspired together to place Plaintiff in administrative segregation and keep her there to pressure her into cooperating with their investigation of Plaintiff's relationship with **C.O. ILLA**.

87. This tactic was used to force Plaintiff to discuss the intimate details of her abuse.

88. These actions constituted punishment of Plaintiff for being a victim of sexual abuse.

89. Plaintiff remained in isolation for nearly eight months.

90. This long period of solitary confinement caused Plaintiff to suffer substantial psychological and physical harm.

16

## IV.    The Assault in SHU.

91.    When Plaintiff was arriving at SHU, **C.O. ALI** told Plaintiff that the correctional officers knew about her relationship with **C.O. ILLA**. While Plaintiff was in SHU, **C.O. ALI** and others talked openly about this relationship. The officers taunted Plaintiff saying that they would have cooperated against **C.O. ILLA** rather than go to SHU.

92.    While in segregation, Plaintiff was permitted recreation time with other inmates. One such inmate, K.W., had learned of Plaintiff's relationship with **C.O. ILLA** and taunted Plaintiff about the relationship. K.W. threatened to harm Plaintiff.

93.    Upon information and belief, K.W. had learned of the relationship via the conversations and remarks by the correctional officers.

94.    K.W. was known to be violent at BHCF. At the time, K.W. was in SHU for a sanction involving assault on staff. K.W. also had a previous history of assaultive behavior.

95.    Plaintiff promptly reported the threat to BHCF's PREA coordinator and **CAPT. ARTUZ**.

96.    On June 6, 2016, an order was made in the SHU logbook that Plaintiff was to "REC ALONE." This meant that Plaintiff was to only be given recreation time alone, without other inmates present.

17

97. On June 9, 2016, despite the order to "REC ALONE," **C.O. ALI** disregarded the order in the logbook and allowed K.W. into the recreation yard with Plaintiff. The inmate attacked Plaintiff causing injuries to Plaintiff.

98. Plaintiff suffered injuries to the face, head, neck and arm. Plaintiff was placed in the infirmary for observation.

99. Even though Plaintiff only acted to defend herself, and had previously warned of the threat, Plaintiff was disciplined for fighting.

100. Plaintiff successfully challenged the disciplinary action and had it expunged.

101. On or about June 14, 2016, Plaintiff filed a grievance against **C.O. ALI** for putting Plaintiff in the recreation yard with K.W. despite the order that Plaintiff was to "rec. alone."

102. To date, Plaintiff has not received notice of the resolution of the grievance, despite repeated attempts to follow up on its status.

103. Upon information and belief, the discipline of Plaintiff for fighting was retaliation for Plaintiff's refusal to cooperate in the investigation into **C.O. ILLA**.

## V. The Assault by C.O. Moss

104. On or about July 2017, an event was being held in the recreation yard at BHCF.

105. During the event, C.O. MOSS approached Plaintiff and loudly said, in front of other correctional officers and inmates, "This is the bitch messing with C.O.

ILLA." This retaliatory statement revealed that correctional staff were violating PREA by openly discussing Plaintiff's involvement with **C.O. ILLA**.

106. Plaintiff's friend, a fellow inmate, Melissa Cotton, reported the incident to **SGT. SPEIGHTS**.

107. Upon information and believe, **SGT. SPEIGHTS** did nothing to intervene on Plaintiff's behalf.

108. Throughout the event in the recreation yard, **C.O. MOSS** continued to verbally harass Plaintiff, following her around the yard to yell obscenities into Plaintiff's face.

109. Upon information and belief, none of the correctional officers or staff present at the event did anything to intervene on Plaintiff's behalf.

110. Upon information and belief, **C.O. MOSS** then turned off her body camera and approached within inches of Plaintiff's face, where she continued to scream at Plaintiff and threatened to fight her by saying, "I say what I wanna say. We can do this anywhere."

111. Upon information and belief, other correctional officers, including **C.O. DUKES**, **C.O. DOEs #5-6**, **C.O. JANE DOEs #1-2** formed a circle around Plaintiff and **C.O. MOSS** to witness the confrontation, but they did nothing to intervene on Plaintiff's behalf.

112. Upon information and belief, Melissa Cotton then entered the circle, removed Plaintiff, and escorted her out of the recreation yard and back into the facility.

19

113. Upon information and belief, **SGT. SPEIGHTS**, **C.O. MOSS**, and **C.O. DUKES** were suspended for their inappropriate behavior toward Plaintiff.

### VI. Defendants are Aware of Systematic Failures to Protect Female Inmates From Sexual Abuse by Correctional Staff

Sections A-C below are taken from the Complaint filed in *Jones v. Annucci*, ECF 16-cv-1473(RA) at ¶¶s 15-52, which are fully incorporated into this complaint.

#### A. Defendants Know that Women Prisoners are at Substantial Risk of Sexual Misconduct by DOCCS Staff

114. Defendants are aware that prisoners are at risk of sexual abuse from prison staff.

a. Awareness of the risk and incidence of sexual abuse in a prison setting has led the federal government, the District of Columbia, and all fifty states[1] to enact statutes criminalizing any sexual contact between prisoners and correctional staff. *See, e.g.*, N.Y. Penal Law § 130.05(e).

b. Awareness of the risk of custodial sexual abuse has led to the enactment of PREA.

c. OSI receives approximately 200 complaints of staff sexual misconduct and harassment each year.[2]

---

[1] National Criminal Justice Reference Service, National Prison Rape Elimination Commission Report at 37 (June 2009), https://www.ncjrs.gov/pdffiles1/226680.pdf.

[2] U.S. Dept. of Justice, Bureau of Justice Statistics, "Survey of Sexual Violence in Adult Correctional Facilities 2009–2011," Statistical Tables at 7-11 (Jan. 2014), http://www.bjs.gov/content/pub/pdf/ssvacf0911st.pdf (in 2011, there were 184 allegations of staff sexual misconduct and 24 allegations of staff sexual harassment; in 2010, 168 allegations of staff sexual misconduct and 65 of staff sexual

115. For a number of reasons and from a variety of sources, Defendants are aware that assigning male staff to guard female prisoners creates obvious risks of sexual abuse.

a. Defendants are aware that sexual abuse occurs in their women's facilities[3] and that sexual abuse of women prisoners is primarily perpetrated by male corrections staff.

b. Awareness of the risk and incidence of sexual abuse in a prison setting has led to the promulgation of international standards prohibiting the assignment of male correctional staff to guard women prisoners. United Nations Standard Minimum Rules for the Treatment of Prisoners, Rule 53, adopted Aug. 30, 1955.

c. Awareness of the risk and incidence of sexual abuse in a prison setting, including the particular risks facing women prisoners, has led several states and local correctional institutions to require the presence of female staff to guard women prisoners, and even to remove men from guarding women prisoners, at least in housing areas.[4]

harassment, and in 2009, 173 allegations of staff sexual misconduct and 38 of staff sexual harassment) ("2009-2011 BJS Sexual Violence Statistics").

[3] *See* Ex. A, August 26, 2015 Letter from DOCCS (Kimberly Sesselman, Assistant Records Access Officer, response to counsel request under the NYS Freedom of Information Law ["FOIL"] detailing that 78 investigations into staff sexual abuse were opened at the women's prisons in 2012, and 61 were opened in 2013) ("Aug. 26, 2015 FOIL Response").

[4] *See, e.g., Teamsters Local Union No. 117 v. Washington Dep't of Corrs.,* 789 F.3d 979 (9th Cir. 2015) (holding that the Washington Department of Corrections was entitled to the bona fide occupational qualification ("BFOQ") defense because it was

d.  Defendants are aware that women prisoners are a particularly

vulnerable population who face a heightened risk of sexual abuse by male

officers. As many as 80% of women prisoners have been physically or sexually

abused prior to their incarceration.[5]  A larger number of incarcerated women

"well justified in concluding that rampant abuse should not be an accepted part of prison life and taking steps to protect the welfare of inmates under its care."); *Tipler v. Douglas County, Nebraska*, 482 F.3d 1023 (8th Cir. 2007) (prison policy relying on Nebraska Code, § 47-111, which required supervision of female inmates in county jails by a female matron, did not violate Title VII); *Everson v. Michigan Dep't of Corrs.*, 391 F.3d 737, 748, 751 (6th Cir. 2004) (reversing trial court's decision and finding that, given the "grave problem of sexual abuse of female inmates," the Michigan Department of Corrections' ["MDOC's] plan to designate certain female-only positions on housing units did not violate the civil rights of corrections officers because sex is a "BFOQ reasonably necessary to the normal operation of [a] particular business or enterprise"); *Reed v. County of Casey*, 184 F.3d 597 (6th Cir. 1999) (upholding a gender-based transfer of a female deputy jailer where it was reasonably required to comply with Kentucky law requiring female supervision of female inmates); *Robino v. Iranon*, 145 F.3d 1109 (9th Cir. 1998) (finding that gender was a BFOQ in assigning female officers to particular posts when those posts required the officers "to observe the inmates in the showers and toilet areas…or provide[] unsupervised access to the inmates."); *Tharp v. Iowa Dep't of Corrs.*, 68 F.3d 223 (8th Cir. 1995) (finding that sex-based shift restrictions do not implicate Title VII where the "policy was adopted to meet legitimate penological concerns… and… plaintiffs ha[ve] many different shift assignments and promotions available to them."); *Torres v. Wisconsin Dep't of Health and Soc. Servs.*, 859 F.2d 1523 (7th Cir. 1988) (en banc) (reversing District Court's finding that defendants had not established sex as a valid BFOQ in supervising female felons under Title VII, and remanding to District Court for further consideration); see also 9 NYCRR § 7504.1(e) ("Supervision of female prisoners shall be accomplished by a matron, and a female prisoner shall not be placed in or removed from a detention area unless the matron is present. The matron shall return the key for the detention area females and no male person shall be permitted to enter an area where female prisoners are detained unless accompanied by the matron.").

[5] 57.2 percent of females report abuse before admission to state prison versus 16.1 percent of males. 39.0 percent of female state prison inmates report that they were sexually abused before admission to state prison versus 5.8 percent of males. U.S. Dept. of Justice Bureau of Justice Statistics, "Prior Abuse Reported by Inmates and Probationers" at 1 (April 1999) ("BJS Prior Abuse"), http://www.bjs.gov/content/

have histories of sexual and physical abuse than male prisoners or women

who have never been incarcerated.[6]   These abuse histories make women

especially vulnerable to coercion and manipulation.[7]

pub/pdf/parip.pdf; *see also* Allison Hastings, Angela Browne, Kaitlin Kall, and Margaret diZerega, "Keeping Vulnerable Populations Safe Under PREA: Alternative Strategies to the Use of Segregation in Prisons and Jails" at 11-13 (March 2015), http://www.vera.org/pubs/housingvulnerable-populations-prea-guide ("[W]omen in the criminal justice system report more extensive victimization histories – of sexual and physical abuse – than women who have not been incarcerated or men who have been incarcerated. In one study of women in … maximum security prison, more than half (59%) of women in the study reported childhood sexual molestation, and 77 percent reported lifetime physical or sexual assaults by non-intimates.").

[6] BJS Prior Abuse, *supra*, note 7, at 1-2 (over one-third of female state prisoners and jail prisoners reported being abused as children, compared to estimates from 12-17% of females in the general population.); Browne, A., Miller, B., & Maguin, E., Prevalence and Severity of Lifetime Physical and Sexual Victimization Among Incarcerated Women, International Journal of Law and Psychiatry 22 at 301-322 (1999) (finding higher rate of abuse history than BJS data, with 70% of incarcerated women interviewed in a New York maximum security prison reporting physical violence and nearly 60% reporting sexual abuse).

[7] *See* Cindy Rich, Amy Combs-Lane, Heidi Resnick & Dean Kilpatrick, Child Sexual Abuse and Adult Sexual Revictimization, From Child Sexual Abuse to Adult Sexual Risk: Trauma, Revictimization, and Intervention (2004). A 2013 report from the DOJ's Bureau of Justice Statistics states that "[i]nmates who experienced sexual victimization before coming to the facility were also more likely than inmates with no sexual victimization history to report incidents of sexual victimization involving other inmates and staff." U.S. Dept. of Justice, Bureau of Justice Statistics, "Sexual Victimization in Prisons and Jails Reported by Inmates 2011-12" at 19 (May 2013) ("2011-2012 BJS Statistics"), www.bjs.gov/content/pub/pdf/ svpjri1112.pdf; Messman-Moore, T.L. & Long, P.J., "Child Sexual Abuse and Revictimization in the Form of Adult Sexual Abuse, Adult Physical Abuse, and Adult Psychological Maltreatment," J. Interpers. Violence 15 (5) at 489-502 (May 2000) (women with childhood sexual abuse history were more likely to experience adult sexual violence, physical violence and psychological maltreatment as adults, and were more vulnerable to verbal coercion or pressure from individuals in authority).

116.    In addition to awareness based on the ample information regarding the problem of staff sexual abuse in correctional settings generally, Defendants are aware of the substantial risk to women prisoners of sexual misconduct by male staff in New York facilities given DOCCS' own actual experience, particularly because DOCCS knows that sexual abuse is significantly under-reported in the prison context.[8]

a.  In 2012, 78 investigations were opened by the Sex Crimes Unit (hereinafter "SCU") into sexual misconduct involving DOCCS staff at the all-women's prisons, which currently include Albion, BHCF, and Taconic.[9]  In 2013, 61 such investigations were opened.[10]

b.  Women prisoners, although a small segment of the total DOCCS inmate population, represent a disproportionately high percentage of victims of staff-on-inmate sexual abuse in Defendants' prisons.[11]

---

[8] United States Dep't of Justice, "Regulatory Impact Assessment for PREA Final Rule" at 17-18 (May 17, 2012), http://www.ojp.usdoj.gov/programs/pdfs/prea_ria.pdf ("DOJ Regulatory Impact Assessment").

[9] Two women's prisons, Beacon and Bayview Correctional Facilities, were closed in 2013.

[10] Ex. A, Aug. 26, 2015 FOIL Response, *supra*, note 5.

[11] 95.6% of the 53,565 prisoners in custody as of January 1, 2014 were male, and only 4.4% were female. *See* DOCCS, "Under Custody Report: Profile of Under Custody Population as of January 1, 2014," at 17, http://www.doccs.ny.gov/Research /Reports/2014/Under Custody_Report_2014.pdf. However, there were 84 allegations of abuse from the women prisons in 2012 and 68 in 2013, compared with overall complaints by all prisoners of sexual abuse by staff of 211 allegations in 2009, 233 in 2010 and 208 in 2011. *See* Ex. A, Aug. 26, 2015

c.  A disproportionate number of the more than 200 complaints of sexual abuse and harassment that OSI receives each year arise from the women prisons.[12]

d.  As recently as 2014 and 2015, male correctional staff from DOCCS women prisons have been criminally charged or convicted of crimes of sexual misconduct, including, most recently, several correction officers from BHCF. DOCCS received complaints of sexual misconduct about some of these officers prior to the incidents leading to their arrest, and yet failed to increase supervision over these officers.

e.  Women prisoners have been impregnated by male staff in DOCCS prisons.[13]

f.  The DOJ's Bureau of Justice Statistics periodically releases reports of anonymous surveys on rezation in prisons and jails. The last time that women prisoners in New York were included in the survey, New York State prisoners self-reported the highest rates of staff sexual abuse in the nation.[14]

---

FOIL Response, *supra*, note 5 (78 allegations of sexual misconduct in women prisons during 2012; 61 allegations during 2013).

[12] *See id.*; see 2009-2011 BJS Sexual Violence Statistics, *supra*, note 4.

[13] Alysia Santo, Raped Behind Bars, Albany Times Union, Sept. 9, 2013, available at www.timesunion.com/local/article/raped-behind-bars-4795883.php#page-1 ("Prison officials say there have been seven pregnancies since 2000 in which the father of the inmate's child was a staff member from the facility").

[14] Beck, Harrison, Berzofsky, Caspar, & Krebs, U.S. Dep't of Just., Bureau of Just. Stat., "Sexual Victimization in Prisons and Jails Reported by Inmates, 2008-09" at 9 (2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf.

g. Moreover, BHCF reported the second-highest rate of staff sexual abuse for all New York female prisons in 2013 and the highest rate for 2014 and 2015.[15]

h. Defendants have been party to a number of injunctive and damages cases brought in both state and federal courts by women prisoners who have been victims of staff sexual abuse. The cases include the putative class action litigation *Amador v. Andrews*, which was brought on behalf of 17 named plaintiffs in 2003. *See* Case No. 03 Civ. 0650 (S.D.N.Y. 2003). In the decade-plus during which that case was pending, there were several motions to amend the Complaint to add new named plaintiffs and identify policy failures to reflect the ongoing sexual abuse problem within DOCCS.

i. The New York State Court of Claims has similarly seen several cases in which a woman inmate has brought claims against the State for abuse by an officer with prior complaints of sexual abuse. See, e.g., *Patterson v. State of New York*, 44 Misc. 3d 1230(A) (Ct. Cl. Aug. 29, 2014) (granting the claimant's motion for summary judgment and finding State liable when an officer sexually assaulted her following repeated complaints of sexual abuse by other prisoners); *Anna O. v. State*, No. 114085, M-80202 (N.Y. Ct. Cl. Aug. 15, 2012) (finding state liable when "Defendant had notice of [Officer's] propensity to pursue unauthorized relationships with inmates and yet left

---

[15] N.Y. State Corr. and Cmty. Supervision, "Annual Report on Sexual Victimization, 2010" at 8 (2010), http://www.doccs.ny.gov/Research/Reports/2017/Annual_Report_on_Sexual_Victimization_2015_Report.pdf.

him in the position to continue to pursue the same, which was the proximate cause of the later rape of Claimant by [Officer]."); *Morris v. State*, Cl. No. 100694-A, M-80583 (N.Y. Ct. Cl. Mar. 6, 2012) (finding state liable when Officer had multiple previous unsubstantiated allegations of sexual assault against him, and was permitted to continue supervising inmates, in some cases as a roundsman under "diminished supervision").

117. Defendants know that cases that result in criminal prosecutions or the discipline of staff do not reflect the entire universe of staff misconduct, given that Defendants only investigate incidents of sexual misconduct, harassment, and abuse that have been reported, and Defendants know that staff sexual abuse is significantly underreported.[16]

a. Victims of sexual abuse, generally, are unlikely to come forward with complaints of sexual misconduct due to embarrassment and humiliation and a fear that such complaints will be greeted with skepticism or disbelief.

b. These concerns are exacerbated in a correctional setting, where the persons to whom such complaints are to be made are colleagues of the perpetrator(s) of the abuse, putting the victim at risk of retaliation; where complaints of such abuse are not maintained in a confidential fashion; and where there is a well-founded belief by women prisoners that such complaints

---

[16] *See* DOJ Regulatory Impact Assessment, *supra*, note10, at 17-18 (concluding that, based upon the 2008-2009 BJS survey, between 69-82% percent of inmates who reported sexual abuse in response to the survey had never reported an incident to corrections staff).

will be greeted with skepticism and will not result in any action against the perpetrator.

c. Women prisoners who were subjected to physical or sexual abuse prior to their incarceration, particularly those who complained to no avail, may face additional psychological and emotional obstacles to complaining of sexual misconduct while in prison. These women are unlikely to come forward with such complaints while in prison.[17]

d. Women prisoners are justified in believing that their reports will be disbelieved: of the allegations of staff sexual misconduct that are reported, DOCCS substantiates only a small percentage, a percentage that continues to fall.[18]

118. Defendants' failure to implement and enforce policies and practices that would actually prevent and punish all sexual abuse contributes to a lenient and permissive prison culture and increases the risk of sexual abuse of women prisoners.

---

[17] *See generally, id.*

[18] *See* Beck, Harrison, Berzofsky, Caspar, & Krebs, U.S. Dep't of Just., Bureau of Just. Stat., "Sexual Victimization in Prisons and Jails Reported by Adult Correctional Authorities, 2000-11" at 1 (2014), https://www.bjs.gov/content/pub/pdf/svraca0911.pdf (explaining that even though the number of allegations of sexual abuse continues to increase, the number substantiated remains virtually unchanged); *see also* 2009-2011 BJS Sexual Violence Statistics, *supra*, note 4, at 7-11; Ex. B, Dec. 2, 2015 Letter from DOCCS (Deputy Counsel Nancy Heywood) response to clarification and appeal under the NYS Freedom of Information Law (detailing that of 78 investigations opened at the four female facilities in 2012, four involving male staff were substantiated, and, in 2013, of the 61 investigations opened, two involving male staff were substantiated).

28

a. Some of the abuse that takes place in prisons is deemed by staff to be "consensual." In other words, the inmates are not necessarily subjected to physically forcible abuse, but rather appear to enter into sexual contact voluntarily. However, any purportedly "consensual" sexual activity between correctional staff and the prisoners they are paid to guard and control is a fallacy, regardless of the "willingness" of the prisoner. Consent in such circumstances is non-existent under the law, as nearly every state legislature in the United States has recognized.[19]

b. Purportedly "consensual" sexual activity between inmates and officers does not resemble actual "consent" as it might exist outside of the prison context.

c. Instead, the coercive nature of the relationship between officers and prisoners is well-recognized. There is a clear power differential, with officers having complete discretion over the treatment of the prisoner under his supervision, including the ability to discipline a prisoner should she disobey an order. As previously stated, the recognition of this dynamic is reflected in the criminal laws of almost every state, criminalizing sexual acts by

---

[19] *See* Margaret Penland, <u>A Constitutional Paradox: Prisoner "Consent" to Sexual Abuse in Prison under the Eighth Amendment</u>, 33 Law and Inequality 507, 508 (2015).

correction officers with prisoners and barring the assertion of "consent" as a defense.[20]

d. Frequently, staff increase the level of coercion and manipulation by providing prisoners with contraband such as money, personal care items, food, or even drugs and alcohol. Staff members frequently talk with prisoners about their personal lives and then use the information about their families or about their histories with drug and alcohol abuse for further coercion.[21]

e. There is often evidence of physical force during the sexual acts themselves. These acts of aggression and violence intimidate the women victims and make them fearful of how the staff person may harm them should they reject any future advances or requests.

f. And finally, once an officer has convinced a prisoner to "go along" with sexual activity, it is increasingly difficult for the prisoner to extricate herself from the "relationship" for fear of retaliation by the officer or his colleagues.

---

[20] *See* Project on Addressing Prison Rape, "Fifty-State Survey of Criminal Laws Prohibiting Sexual Abuse of Individuals on Custody" (Sept 10. 2013), https://www.wcl.american.edu/endsilence/documents/50StateSurveySSMLAWS2013Update.pdf.

[21] D.O.J., National Institute of Corrections, "Research, Practice and Guiding Principles for Women Offenders, Gender Responsive Strategies," at 5 (June 2003), www.nicic.gov/library/files/018017.pdf ("Women's substance abuse has been shown to be highly correlated with physical and sexual abuse. Women in state prisons who had experienced abuse prior to their arrests reported higher levels of alcohol and drug abuse.").

**B. Defendants Fail to Enact Supervisory Policies that Would Prevent Sexual Abuse by Male Staff and Fail to Enforce Existing Policies**

119. Despite known risks and incidents of sexual misconduct by staff, Defendants, through their policies and practices (or lack thereof) have recklessly disregarded these risks, and have failed to protect the women prisoners in their custody from harm.

120. Defendants inadequately supervise corrections staff, placing women prisoners at a heightened risk of sexual abuse.

121. Defendants have failed to enact appropriate rules and policies concerning the behavior of male staff and fail to enforce existing rules and policies governing staff behavior.

122. Despite knowledge of the risk of sexual abuse in women's prisons, Defendants assign male staff to posts on which they have ample opportunity for unmonitored contact with women prisoners.

   a. Defendants have designated very few assignments within DOCCS' women's prisons as female-only posts,[22] and Defendants supervise male staff guarding female prisoners no differently from the way they would supervise same-gender supervision of men.

   b. Male staff may be assigned, alone, to areas where no other staff are within range for visual contact. This includes assignments that cover remote

---

[22] *See* Ex. C, DOCCS Directive 2230, "Guidelines for Assignment of Male and Female Officers" at § II.A-D.

or isolated areas not monitored by video surveillance and even overnight shifts in housing areas.

    c.   Defendants allow male correctional staff to bid for (to choose) their own assignments, without regard to the number or severity of allegations of sexual misconduct that have been made by women prisoners about them.

123.   Defendants have failed to enact adequate rules and policies to monitor and discipline staff engaged in behavior that constitutes warning signs of sexual abuse, such as spending a disproportionate amount of time talking to a particular prisoner, repeatedly requesting a particular prisoner for a particular assignment, discussing their personal life with a prisoner, or asking a prisoner personal questions. Staff are not disciplined or informally counselled when supervisors witness behavior that is indicative of warning signs of sexual abuse.

124.   Defendants have failed to enact adequate rules and policies to protect women prisoners from sexual innuendoes, degrading sexual comments, and propositioning, and to enforce those rules and policies that do exist.

125.   Defendants have failed to enact appropriate rules and policies concerning the behavior of male staff posted to housing units in order to protect the privacy of women prisoners and to protect them from harassment. Defendants also fail to enforce those rules and policies that do exist. For example, DOCCS policy requires male staff to announce their presence only the first time that they enter a living area,[23] allowing male officers to re-enter living quarters and bathroom areas

---

[23] *See id.* at § II.E.

unannounced, and to watch women dress and undress. Male staff are not disciplined or reprimanded for such conduct.

126. Defendants have failed to take sufficient action when officers leave their assigned posts, allow inmates into areas where inmates are not permitted, ask women to volunteer or work on jobs to which they have not been formally assigned, and engage in open and obvious behavior that is clearly suggestive of inappropriate relationships.

127. Defendants permit officers virtually unfettered access to private, unmonitored areas such as bathrooms, kitchen store rooms, storage closets, slop sink areas, basements, classrooms, laundry areas, and private areas of prison yards. At the same time, Defendants fail to prohibit officers from being alone with women prisoners in such areas where sexual abuse of women prisoners is easily accomplished. When instances of staff sexual misconduct have been substantiated, they are often found to have occurred in these isolated, and largely unmonitored, areas.

128. Defendants fail to require and conduct reasonable searches of correctional staff upon entry to correctional facilities that could help prevent or discourage sexual abuse or ultimately assist in the investigation of allegations of staff sexual misconduct. The failure to catch correctional staff with contraband such as drugs and alcohol, or to limit entry of condoms, cell phones, notes, and other personal items allows officers the opportunity to use these items to influence,

coerce, or otherwise manipulate prisoners into performing sexual acts and limits the evidence that could be used in investigations of staff sexual misconduct.

129. Defendants fail to increase the supervision of those correctional officers known to pose a heightened risk of sexual abuse to women prisoners.

a. Defendants have failed to promulgate policies that would provide for additional rounds to more closely supervise staff about whom complaints of sexual abuse have been made.

b. Staff who are the subject of credible or repeated allegations of sexual abuse are allowed to continue their usual posts and permitted to access private, unmonitored areas. They can even be permitted to continue to guard or to have contact or proximity with the prisoner who has complained about the officer.

130. To the extent Defendants have installed or required installation of surveillance cameras, use of those cameras for supervision remains grossly inadequate to protect women prisoners.

a. Surveillance cameras have not been installed throughout the women's prisons. Many enclosed and isolated areas inside the prison, or isolated areas outside the prison, where sexual abuse is more likely to occur, or has been reported to have occurred, are completely outside of any video or audio surveillance. These areas include storage closets, laundry rooms, slop sink areas, sheds, outside work areas, and basements.

34

b. For areas for which there are privacy concerns, like bathrooms, living areas, and religious program areas, Defendants have failed to reduce the use of these areas for sexual abuse by installing video surveillance that would show entry and exit from these areas or movement within them, such as staff lingering by beds in dorm areas.

c. Upon information and belief, camera placement is not informed or increased upon receipt of multiple credible complaints of or other knowledge of abuse occurring in particular areas or by particular staff assigned to a particular area.

131. Staff are left alone and virtually unmonitored by supervisors for hours at a time, with staff supervision consisting almost entirely of supervisory "rounds."

132. Defendants fail to enact and enforce adequate rules and policies that dictate the content and substance of limited supervisory rounds.

a. Facility supervisory rounds can consist of merely stopping by the assigned line officers' desk or office, signing the logbook and nothing more.

b. There is no requirement that supervisory staff must see each officer on duty, check in verbally with each officer, ask the officers any particular questions, speak with the prisoners on a housing unit or program assignment, or ask them if they have problems, or that they observe the entire area, the prisoners and the staff, for any misconduct, or make any notations on what they observe.

c.  On information and belief, supervision does not include observation and counselling or discipline for officers engaged in behavior evincing warning signs of sexual abuse, including engaging in personal conversations with inmates, sharing personal items with inmates, or repeatedly requesting a particular inmate for special assignments in secluded locations.

133.  Defendants fail to require a set number and frequency of supervisory rounds by most supervisory officers. Only rounds by the Superintendent and her executive team are required at a specified frequency, and that is only once a week,[24] with no other written policies and procedures directing the frequency and regularity of rounds. In practice, sergeants typically visit each post once or twice per shift.

134.  Defendants fail to require unpredictable supervisory rounds. Facility supervisors routinely conduct rounds in a predictable manner, failing to vary their time, frequency, and point of entry, leaving staff able to predict periods of time, such as the time around shift change or after a supervisor has passed through, when they can virtually be assured that they can engage in sexual misconduct with women prisoners without being discovered.

135.  In addition, Defendants fail to enforce existing policies concerning unannounced supervisory rounds. Therefore, even where line officers might be unable to predict a time frame without rounds, they nonetheless receive a warning of imminent rounds from their co-workers. In some cases, supervisory staff actually inform officers of their next destination while conducting rounds, and officers use

---

[24] Ex. D, DOCCS Directive 4001 "Facility Administrative Coverage and Supervisory Rounds", § VI.

that information to alert the officers at the supervisor's next destination that the supervisor will soon be approaching. Although nominally a new policy limiting such conduct has been promulgated, officers continue to call, radio, or use other ways to alert staff, such as tapping on their walkie-talkies in order to indicate that a supervisor is approaching. On information and belief, Defendants fail to take steps to enforce this policy, making no effort to assess whether it is being followed, and fail to discipline staff for insubordination if they observe or otherwise find that staff have ignored or violated this policy.

### C. Defendants Maintain Grossly Inadequate Policies and Practices for Investigating and Taking Action in Response to Complaints of Sexual Assault

136. Defendants' system for the reporting, investigation, and response to complaints of sexual misconduct is grossly inadequate to prevent and remedy ongoing sexual misconduct. The current system, which relies almost completely upon women prisoners to come forward and report the misconduct, fails to utilize reasonable and available investigative tools, fails to credit allegations of sexual misconduct unless the woman has physical proof or other substantial corroboration of the misconduct, is biased, deters women prisoners from reporting sexual misconduct, and fails to take appropriate action against perpetrators if and when women do come forward. The effect of this system is to allow sexual misconduct by staff to continue virtually unabated.

i. **Defendants Fail to Take Affirmative Steps to Investigate Staff Sexual Misconduct Despite Knowledge That Sexual Abuse Is Under-Reported, Thus Placing Women Prisoners at an Increased Risk of Abuse.**

137. Defendants know that, given the reluctance of victims of staff sexual abuse to come forward, having an investigative and discipline system that relies primarily on women prisoners to volunteer complaints is insufficient to prevent and remedy this misconduct. Nonetheless, Defendants rely on such a system and fail to utilize other means to root out sexual misconduct.

138. Women prisoners, particularly those who receive favors from officers such as contraband, are unlikely to report abuse because they understand they may be subject to punishment and are therefore chilled and deterred from reporting, thereby perpetuating staff misconduct.

a. Women understand that they may be charged with disciplinary offenses such as possession of contraband, being out of place, or inappropriate conduct with an officer. Women also understand that they may be charged with making false statements if DOCCS does not believe their complaints were made in good faith.

b. Women who make such complaints are often transferred to different prisons, while the perpetrator is permitted to continue working in the same facility. These transfers may disrupt women's contact with their children and family, and participation in program and job assignments. Because disciplinary history, placement in administrative segregation, and program and job assignments are considered by the merit board and the parole board,

38

a woman who complains about sexual misconduct also risks lengthening her incarceration.

139. Despite the low likelihood of receiving reports from women prisoners about abuse by staff, Defendants rarely employ obvious measures to reduce the risk of sexual misconduct between staff and women prisoners and to prevent misconduct from occurring, escalating, or continuing. These include measures such as heightened monitoring of situations where there have been warning signs of sexual misconduct or inappropriate relationships; searches of correctional staff; use of lie detectors; real-time review of video camera feeds; periodic review of camera footage; use of electronic recording devices; exit interviews of prisoners upon transfer and release; random interviews of staff and prisoners; and frequent, varied, and unannounced rounds by supervisory officials.

140. When an area is under camera surveillance, Defendants fail to adequately use that surveillance footage to prevent or detect sexual abuse.

a. Upon information and belief, camera footage is only reviewed after there has been an allegation of sexual abuse occurring in or around an area where video cameras are installed. No real time or live-action review is conducted that might reveal misconduct or suspicious behavior. Nor is there periodic review of footage recorded earlier in time.

b. Defendants do not maintain camera footage for a sufficient amount of time considering the frequent delays in reporting. Defendant's maintenance of camera footage is especially lacking when considered in light of how

39

heavily Defendants rely on video footage for substantiating allegations. Digital video is maintained for only a matter of days, not the time needed in a sexual abuse investigation, given the widespread knowledge of victims' reluctance to come forward.

141. Defendants also fail to eliminate a pervasive culture of corrections staff to "look the other way" when a fellow correctional officer is engaged in an inappropriate relationship with an inmate. In more than half of reported incident, the report is made by the victim or another inmate, while only 25% of incidents are reported by correctional officers or staff.[25]

### ii. Defendants' System for Investigating Complaints of Staff Sexual Misconduct is Inadequate and Places Women Prisoners at an Increased Risk of Abuse.

142. Defendants' treatment of women prisoners' complaints of sexual misconduct by staff essentially dooms those complaints to failure. An allegation of sexual misconduct based exclusively or primarily on the statement of a woman prisoner will not be substantiated, and will not result in any action being taken against the staff person, even if credible and even if supported by witnesses.

143. Defendants require an unreasonable burden of proof before substantiating an allegation of staff sexual misconduct and taking administrative or disciplinary action with respect to male staff.

---

[25] *See* Beck, *supra*, at 15 (2014), https://www.bjs.gov/content/pub/ pdf/svraca0911.pdf

a.  Investigators do not apply any consistent standard in determining whether to substantiate an allegation of staff sexual misconduct and refer it for administrative action.[26]  Typically, for an allegation of sexual misconduct or abuse to be substantiated, there must be either physical evidence or video surveillance.

b.  Defendants' investigations to determine if an allegation of staff sexual abuse should be substantiated do not give adequate, if any, weight to indicia of sexual misconduct in the absence of physical evidence.  Such indicia include staff persons being seen out of place; staff persons allowing inmates into areas where inmates are not permitted; staff persons engaging in behavior suggestive of an inappropriate relationship; and staff giving contradictory statements to investigators.

c.  Upon information and belief, Defendants' investigations fail to give adequate weight to similar prior complaints of sexual misconduct against the same staff member.  Such patterns may include allegations that a staff member has used the same language in propositioning more than one woman prisoner; allegations that an officer has taken more than one woman prisoner to the same location to engage in sexual abuse, or allegations that an officer has avoided having witnesses to the misconduct by engaging in the abuse

---

[26] Ex. E, Excerpts from Testimony of Sex Crime Unit Investigator Frank Annarino at 122 -124, July 17, 2012 (rough transcript), *McDonald v. Gilbert*, Cae No. 6:10-cv-06702 (JWF), (W.D.N.Y. 2012) (Annarino could not confirm that burden of proof *was not* beyond a reasonable doubt, and testified that burden of proof "depends on the case" as "each case is different.").

during the count, when other inmates are locked into their cells and therefore unable to observe it.

d. Defendants' investigations fail to give adequate weight to the credibility of witnesses. They do not credit the statements of prisoner witnesses, while giving undue weight to statements of staff.

144. Defendants' investigations are not thoroughly or timely conducted and often result in biased and unreliable refusals to substantiate women prisoners' complaints.

a. Upon receiving a report of sexual abuse, Defendants fail to protect women prisoners who complain of experiencing sexual misconduct by staff from retaliation or intimidation.

b. During the investigation of a complaint, an alleged perpetrator of sexual misconduct can remain in the same prison and can even continue to be posted in areas where he will be in contact with or responsible for guarding the victim of the misconduct.

c. The fear of retaliation by the officer or his colleagues can discourage women prisoners (both victims and witnesses) from cooperating with investigators when sexual abuse has been reported.

d. Defendants do not always complete investigations into claims of sexual harassment and abuse in a prompt manner, potentially subjecting both the woman who has complained and other women prisoners to continued abuse

for weeks or months until an investigation is complete, and subjecting the victim to continued uncertainty.

e. Because Defendants do not maintain camera footage for a sufficient amount of time, any delays in investigation increase the already significant possibility that potentially corroborating camera footage will no longer be available.

145. Investigations are not often conducted in a thorough, professional, and unbiased manner. Instead, investigators' methods are often hostile, use inappropriate language, reveal confidential information about prisoners and investigations to other prisoners, and ultimately result in deterring complete and truthful statements from those they interview or chilling prisoner participation completely.

a. The OSI, which investigates allegations of staff sexual abuse, is part of DOCCS. It is not an independent agency.

b. Most investigators are former corrections officers, and some are staffed to investigate the same facilities where they formerly worked as corrections officers (and, therefore, their former colleagues). Many investigators eventually return to work as corrections officers.

c. The standard of proof required to substantiate an allegation of staff sexual abuse is not consistent across cases.[27]

---

[27] *See* Ex. E, *id.* at 122:20-123:4.

d. Investigators may either fail to obtain, or unreasonably delay obtaining, physical evidence even when such evidence could be probative. For example, locations or materials potentially containing DNA that would be corroborative of the complaint have at times not been timely collected.

e. Information provided to OSI investigators is also not kept confidential, even when staff promise confidentiality. Prisoners interviewed as potential witnesses are frequently told the identity of the prisoner and staff person being investigated, who made the initial allegation, and what other prisoners have said to the investigator.

f. Because staff do not conduct investigations into complaints of sexual misconduct in a confidential manner, the perpetrators of misconduct or their colleagues can easily learn of the investigation and inflict harassment or retaliation upon women prisoners.

146. As a result of Defendants' policies and/or practices, staff against whom credible complaints of sexual misconduct have been lodged are not moved away from contact with women prisoners; rather, they are left in a position where they can continue to engage in sexual misconduct or retaliation virtually without fear of repercussions so long as no physical evidence or video footage of the abuse can be discovered.

147. DOCCS policies and procedures unreasonably fail to prevent retaliation by other staff when women prisoners lodge credible complaints about

sexual abuse. Even when separated from their abusers, women frequently experience retaliation and verbal abuse from friends and colleagues of their abuser.

### iii. Defendant's System for Disciplining Staff is Inadequate and Places Women Prisoners at an Increased Risk of Abuse

148. Upon information and belief, Defendants fail to seek disciplinary action against staff in the absence of physical or video evidence, even when they have received a credible complaint of staff sexual misconduct or even multiple complaints against the same officer.

a. Upon information and belief, even when there is substantial corroboration of a complaint of staff sexual misconduct and even when investigative staff have substantiated an allegation, Defendants do not always seek disciplinary sanctions.

b. In the absence of video corroboration or physical evidence of the misconduct, such as semen or proof of pregnancy, even credible allegations of abuse will result in no action being taken against the staff member.

c. Even where discipline is sought, it is limited to events that are corroborated by officer testimony, video, or other physical evidence.

d. As a result, sanctions for engaging in sexual misconduct do not effectively function as a deterrent. Instead, perpetrators simply use unmonitored areas of the prison to engage in acts of sexual abuse that do not result in physical proof.

149. Upon information and belief, disciplinary staff is undertrained, including those who appear before arbitrators. They have no legal training and no training in the prosecution of sexual abuse cases.

150. Discipline of staff is sought only when there is physical or video evidence to corroborate an inmate's complaint. Even in situations where there is substantial proof of misconduct, including physical proof, officers are often permitted to agree to placement at a men's prison or in the most serious cases, resign from employment and maintain their pensions.

151. Even in situations where there is substantial proof of misconduct, including physical proof, if an officer does not voluntarily leave or disciplinary action is not imposed by an outside arbitrator (or even if it is imposed, upon returning to work), then the officer is permitted to return to his bid post without any increased supervision, even when investigative staff have substantiated the allegation and even when probable cause has been found that criminal activity occurred.

      iv.    **Defendants' Failure to Review and Assess Policies and Procedures Places Women Prisoners at an Increased Risk of Abuse.**

152. Defendants have structured their system for addressing allegations of staff sexual misconduct so that there is virtually no assessment of whether any of Defendants' policies or procedures may have allowed the misconduct to take place. For example, investigative staff do not consider it part of their function to determine whether policies or procedures have enabled the sexual misconduct to

take place or have allowed it to continue—for example—failing to regulate one male staff person being alone in enclosed areas with a female prisoner, allowing staff to pick certain prisoners for programs or work crews under their supervision, or allowing staff to ignore warning signs like prolonged conversations with a prisoner or obvious misconduct on the part of other officers.

## FIRST CAUSE OF ACTION

## CRUEL AND UNUSUAL PUNISHMENT
## IN VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (Against C.O. ILLA)

153. Paragraphs 1-150 are hereby incorporated and realleged.

154. In touching Plaintiff's vagina in or about March 2015, **C.O. ILLA** acted willfully and wantonly for his own sexual gratification.

155. There was no penological justification for **C.O. ILLA**'s conduct.

156. **C.O. ILLA**'s conduct was unreasonable and in violation of Plaintiffs' clearly established constitutional right to be free from cruel and unusual punishment.

157. **C.O. ILLA**'s conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.


## SECOND CAUSE OF ACTION

## DELIBERATE INDIFFERENCE
## VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (Against COMM. ANNUCCI,
### COORD. EFFMAN, and SUPT. KAPLAN)

158. Paragraphs 1 – 155 are hereby incorporated and realleged.

159. **COMM. ANNUCCI**, **COORD EFFMAN**, and **SUPT. KAPLAN**, were aware that male correctional officers at BHCF were repeatedly accused of sexually abusing female inmates.

160. **COMM. ANNUCCI**, **COORD. EFFMAN**, and **SUPT. KAPLAN**, failed to implement policies sufficient to protect inmates from sexual abuse by correctional officers.

161. **COMM. ANNUCCI**, **COORD. EFFMAN**, and **SUPT. KAPLAN**, were deliberately indifferent to a serious risk to the safety of all female inmates at the hands of male correctional officers at BHCF.

<u>THIRD CAUSE OF ACTION</u>

DELIBERATE INDIFFERENCE
VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
(Against INV. RUBAINE,
INV. NUNEZ, and INV. BROOMER)

162. Paragraphs 1-159 are hereby incorporated and realleged.

163. **INV. RUBAINE** was aware of the improper relationship between Plaintiff and **C.O. ILLA**. **INV. RUBAINE** made no efforts to stop the relationship as he hoped to gather evidence against **C.O. ILLA**. **INV. RUBAINE** permitted the relationship to continue without notifying Plaintiff.

164. **INV. RUBAINE** was aware that **C.O. ILLA** had frequent access to Plaintiff and supervisory control over her due to his position as a correctional officer. **INV. RUBAINE** was deliberately indifferent to the imminent risk of sexual abuse by **C.O. ILLA** upon Plaintiff that did occur.

165. Upon information and belief, **INV. NUNEZ** and **INV. BROOMER** were also aware of the relationship at the time **INV. RUBAINE** knew of it, and took no action to protect Plaintiff.

49

## FOURTH CAUSE OF ACTION

## NEW YORK COMMON LAW BATTERY
### (Against C.O. ILLA)

166. Paragraphs 1-163 are hereby incorporated and realleged.

167. The sexual assault by **C.O. ILLA** of Plaintiff constituted a battery upon Plaintiff in that the above-described bodily contact was intentional, unauthorized, and grossly offensive in nature.

168. Such contacts caused serious physical, psychological, and emotional pain and suffering, and otherwise caused damage to Plaintiff for which **C.O. ILLA** is liable.

## FIFTH CAUSE OF ACTION

## VIOLATION OF NEW YORK PENAL LAW § 130.52
### FORCIBLE TOUCHING
### (Against C.O. ILLA)

169. Paragraphs 1-166 are hereby incorporated and realleged.

170. The above-described sexual touching of Plaintiff by C.O. ILLA violated New York Penal Law § 130.52.

171. Plaintiff suffered physical and emotional pain and other damages as a result of such touching.

## SIXTH CAUSE OF ACTION

## VIOLATION OF NEW YORK PENAL LAW § 130.55,
### SEXUAL ABUSE IN THE FIRST DEGREE
### (Against C.O. ILLA)

172.    Paragraphs 1 – 169 are hereby incorporated and realleged.

173.    The above described sexual touching by **C.O. ILLA** violated New York

Penal Law § 130.55.

174.    Plaintiff suffered physical and emotional pain and other damages as a

result of the violation of the New York Penal Law.


## SEVENTH CAUSE OF ACTION

### CONSPIRACY TO VIOLATE U.S. CONSTITUTION
### AMENDMENTS V AND XIV RIGHTS TO DUE
### PROCESS AND FREEDOM FROM
### INVOLUNTARY SELF-INCRIMINALTION
### (Against SUPT. KAPLAN, CAPT. ARTUZ,
### CAPT. DAYE, INV. BROOMER and INV. RUBAINE)

175.    Paragraphs 1-172 are hereby incorporated and realleged.

176.    **SUPT. KAPLAN**, **DIR. RODRIGUEZ, CAPT. ARTUZ, CAPT. DAYE**,

**INV. BROOMER, INV. NUNEZ** and **INV. RUBAINE** conspired to retaliate against

Plaintiff for not providing information against **C.O. ILLA**.

177.    As an inmate, Plaintiff could not legally consent to any sexual

touching.  **C.O. ILLA**'s sexual contact with Plaintiff constituted rape.

178.    **SUPT. KAPLAN**, **DIR. RODRIGUEZ, CAPT. ARTUZ, CAPT. DAYE**,

**INV. BROOMER, INV. NUNEZ** and **INV. RUBAINE** knew that Plaintiff could not

be punished for her relationship with **C.O. ILLA** since Plaintiff was the victim.

51

179. Plaintiff is entitled Due Process in an administrative proceeding against her.

180. **SUPT. KAPLAN**, **DIR. RODRIGUEZ, CAPT. ARTUZ**, **CAPT. DAYE**, **INV. BROOMER**, **INV. NUNEZ** and **INV. RUBAINE** conspired to deprive Plaintiff of her Due Process rights by confining Plaintiff to isolation without sufficient legal process.

181. **SUPT. KAPLAN**, **DIR. RODRIGUEZ, CAPT. ARTUZ**, **CAPT. DAYE**, **INV. BROOMER**, **INV. NUNEZ** and **INV. RUBAINE** knew that credible information of any escape plot involving Plaintiff ever existed, and that there was no lawful or legitimate reason to hold Plaintiff in administrative segregation.

182. **SUPT. KAPLAN**, **CAPT. ARTUZ**, **CAPT. DAYE**, **INV. BROOMER**, and **INV. RUBAINE** entered into this conspiracy for the purpose of punishing Plaintiff for her relationship with **C.O. ILLA**; to retaliate against Plaintiff for exercising her Fifth Amendment Right to Silence; and to coerce Plaintiff to cooperate into their investigation of **C.O. ILLA**.

183. As a result of this conspiracy to retaliate, Plaintiff suffered severe physical, psychological and emotional distress.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF U.S. CONSTITUTION AMENDMENTS V AND XIV
## RIGHTS TO DUE PROCESS AND FREEDOM FROM
## INVOLUNTARY SELF-INCRIMINALTION
### (Against SUPT. KAPLAN, CAPT. ARTUZ,
### CAPT. DAYE, INV. BROOMER and INV. RUBAINE)

184.   Paragraphs 1-181 are hereby incorporated and reallaged.

185.   **CAPT. ARTUZ** recommended Plaintiff be placed in administrative segregation as retaliation for Plaintiff's refusal to cooperate in the investigation of **C.O. ILLA**.

186.   **INV. RUBAINE** and **CAPT. ARTUZ** provided deliberately false or misleading information for the express purpose of creating the impression that a conspiracy to escape existed and Plaintiff posed a threat to the safety and security of the facility.   **INV. RUBAINE** and **CAPT. ARTUZ** knew that no such conspiracy existed.

187.   **INV. RUBAINE** and **CAPT. ARTUZ** created the non-existent escape conspiracy as a means to punish Plaintiff for not cooperating in the investigation of **C.O. ILLA** and to coerce Plaintiff to assist them.

188.   **CAPT. DAYE** assisted **INV. RUBAINE** and **CAPT. ARTUZ** by deeming their testimony confidential when, in fact, no reason to deem the testimony confidential existed.  **CAPT. DAYE** deemed the testimony confidential to prevent Plaintiff from hearing the false or misleading testimony and revealing it as untrue.

53

189.    **CAPT. DAYE** knew or should have known that the information provided by **INV. RUBAINE** and **CAPT. ARTUZ** was untrue or misleading.

190.    **CAPT. DAYE** concluded that Plaintiff posed a risk to the population and safety of the facility due to a conspiracy to escape.  Upon information and belief, this purported conspiracy to escape originated from Plaintiff's relationship with **C.O. ILLA**.

191.    **CAPT. DAYE** knew **C.O. ILLA** was suspended and not allowed access to the facility at the time of **CAPT. DAYE**'s decision.

192.    On or about April 13, 2016, **SUPT. KAPLAN** conducted a 60-day review of Plaintiff's Administrative Segregation.  Upon information and belief, **SUPT. KAPLAN** had access to the confidential testimony of **INV. RUBAINE** and **CAPT. ARTUZ**.  **SUPT. KAPLAN** upheld Plaintiff's Administrative Segregation status.

193.    **SUPT. KAPLAN** knew that Plaintiff posed no danger to the safety or security of the facility and was not a threat of escape.

194.    **SUPT. KAPLAN** kept Plaintiff in Administrative Segregation status in retaliation for Plaintiff's refusal to cooperate with the investigation of **C.O. ILLA**.

195.    On or about June 10, 2016, **INV. BROOMER** visited Plaintiff in the SHU and informed Plaintiff that if Plaintiff cooperated with the investigation of **C.O. ILLA**, **INV. BROOMER** would work to get Plaintiff removed from SHU.

54

196. **INV. BROOMER** knew that Plaintiff was put into in administrative segregation as a plan to coerce Plaintiff to cooperate in the investigation of **C.O. ILLA.**

197. Plaintiff spent nearly eight months in solitary confinement.

198. This time spent in isolation has severely damaged Plaintiff's mental health.

199. Shortly after Plaintiff's agreement to cooperate with the investigation, the Administrative Segregation determination was reversed and expunged from her record.

200. The actions of **SUPT. KAPLAN**, **CAPT. ARTUZ**, **CAPT. DAYE**, **INV. BROOMER**, and **INV. RUBAINE** deprived Plaintiff of her Due Process rights prior to sentencing her to administrative segregation.

<u>NINTH CAUSE OF ACTION</u>

**DELIBERATE INDIFFERENCE**
**VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII**
**(Against CAPT. ARTUZ, and C.O. ALI)**

201. Paragraphs 1-198 are hereby incorporated and realleged.

202. On or about June 16, 2016, **C.O. ALI** allowed inmate K.W. into the recreation yard with Plaintiff, despite an order in the SHU command log that Plaintiff was to "<u>REC ALONE</u>." By deliberately ignoring this order, and disregarding Plaintiff's prior warnings, **C.O. ALI** facilitated K.W.'s assault on Plaintiff.

55

203.    Plaintiff had warned **CAPT. ARTUZ** that K.W. had threatened to attack Plaintiff.  **CAPT. ARTUZ** did not take appropriate action to prevent K.W.'s attack on Plaintiff.

204.    As a direct result of the deliberate actions and inaction by **C.O. ALI** and **CAPT. ARTUZ**, Plaintiff suffered physical and psychological injuries as a result of the attack.

<u>TENTH CAUSE OF ACTION</u>

### RETALIATION OF U.S. CONSTITUTION AMENDMENT I
(Against C.O. MOSS)

205.    Paragraphs 1-202 are hereby incorporated and reallaged.

206.    **C.O. MOSS** retaliated against Plaintiff for reporting **C.O. ILLA**'s sexual assault of Plaintiff.

207.    **C.O. MOSS** retaliated against Plaintiff in July 207 by cornering Plaintiff in the recreation yard and yelling, "This is the bitch messing with **C.O. ILLA**."  **C.O. MOSS** continued to follow Plaintiff around the recreation yard and yell obscenities at her.

208.    **C.O. MOSS** then turned off her body camera and threatened to physically assault Plaintiff, stating, "I say what I wanna say.  We can do this anywhere."

209.    As a result of the retaliation, Plaintiff suffered severe psychological and emotional distress.

56

210. By virtue of her retaliation against Plaintiff for her report of **C.O. ILLA**'s sexual assault, **C.O. MOSS** deprived Plaintiff of her right to freedom of speech in violation of her rights under the First Amendment of the United States Constitution.

## ELEVENTH CAUSE OF ACTION

### DELIBERATE INDIFFERENCE
(Against SGT. SPEIGHTS, C.O. DUKES,
C.O. DOEs #5-6; C.O. JANE DOEs #1-2)

211. Paragraphs 1-208 are hereby incorporated and realleged.

212. At all relevant times, **SGT. SPEIGHTS**, **C.O DUKES**, **C.O. DOEs #5-6**, and **C.O. JANE DOEs #1-2** were employed as correctional officers at BHCF.

213. **SGT. SPEIGHTS** acted against protocol when she failed to respond to inmate Melissa Cotton's report that **C.O. MOSS** was violating PREA by openly discussing Plaintiff's involvement with **C.O. ILLA** and, after turning off her body camera, was threatening to physically attack Plaintiff.

214. **C.O. DUKES**, **C.O. DOEs #5-6**, and **C.O. JANE DOEs #1-2** acted against protocol when they witnessed **C.O. MOSS** violating PREA by openly discussing Plaintiff's involvement with **C.O. ILLA** and when they formed a circle around Plaintiff and **C.O. MOSS** while **C.O. MOSS** verbally abused and threatened to physically attack Plaintiff.

215. **SGT. SPEIGHTS**, **C.O DUKES**, **C.O. DOEs #5-6**, and **C.O. JANE DOEs #1-2** failed to act on, and were deliberately indifferent to, information indicating unconstitutional acts might be occurring.

57

## TWELFTH CAUSE OF ACTION

## NEW YORK COMMON LAW ASSAULT
(Against C.O. MOSS)

216. Paragraphs 1-213 are hereby incorporated and reallaged.

217. In approximately July 2017, without justification or provocation, **C.O. MOSS** cornered Plaintiff in the recreation yard, turned off her body camera, and threatened her by stating, "I say what I wanna say, we can do this anywhere."

218. The acts and conduct of **C.O. MOSS** were the direct and proximate cause of injuries and damages to Plaintiff and violated Plaintiff's statutory and common law rights as guaranteed by the laws and the Constitution of the State of New York.

219. **C.O. MOSS** assaulted Plaintiff when **C.O. MOSS** attempted to injure Plaintiff or commit battery upon Plaintiff, and further that **C.O. MOSS**' act represented a grievous affront to Plaintiff.

220. **C.O. MOSS**' actions were intentional, reckless, and unwarranted, and without any just cause or provocation, and Defendant knew, or should have known, that her actions were without the consent of Plaintiff.

221. The retaliatory comments and threat of physical harm caused Plaintiff ongoing humiliation and emotional pain.

58

<u>Prayer for Relief</u>

WHEREFORE, Plaintiff prays for relief and demands judgment in her favor on each of her claims against defendants as follows:

a. That a jury find and the Court adjudge and decree that Plaintiff shall recover compensatory damages in the sum of $10,000,000, plus punitive damages in the sum of $10,000,000, against the defendants in punitive damages, plus $1 against the defendants in nominal damages, jointly and severally, together with interest.

b. That Plaintiff recover the costs of the suit herein, including reasonable attorneys fees pursuant to 42 U.S.C. § 1988.

**c.** That Plaintiff be awarded such other and further relief as the Court shall deem just and proper.

<u>Jury Demand</u>

Plaintiff hereby demands a trial by jury on all issues and counts in the Complaint herein.

Dated: New York, New York
October 16, 2017

Respectfully submitted,

By: _____

Daniel A. McGuinness
Adam D. Perlmutter
Victoria N. Medley

PERLMUTTER & MCGUINNESS, P.C.
260 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (212) 679-1990
Fax: (888) 697-0585
Email: dan@pmlawnyc.com

- and -

*-/s/- Zachary Margulis-Ohnuma*
By:_____
Zachary Margulis-Ohnuma

LAW OFFICE OF ZACHARY MARGULIS-OHNUMA
260 Madison Avenue, Suite 1800
New York, New York
Tel: (212) 685-0999
Fax: (212) 685-0922
Email: zach@zmolaw.com