UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

**YEKATRINA PUSEPA**,

Plaintiff

- against -

**ANTHONY J. ANNUCCI**, Acting
Commissioner of the New York State
Department of Corrections and Community
Supervision;
**JASON EFFMAN**, Associate Commissioner
and PREA Coordinator for New York State
Department of Corrections and Community
Supervision;
**A. RODRIGUEZ,** Acting Director, Special
Housing and For New York State
Department of Corrections and Community
Supervision;
**SABINA KAPLAN**, Superintendent of
Bedford Hills Correctional Facility;
**RUBEN ILLA**, Correction Officer at
Bedford Hills Correctional Facility;
**M. ALI**, Correction Officer at
Bedford Hills Correctional Facility;
**P. ARTUZ**, Correction Officer at
Bedford Hills Correctional Facility;
**MICHAEL DAYE**, Correction Officer at
Bedford Hills Correctional Facility;
**FNU SPEIGHTS**, Correction Officer at
Bedford Hills Correctional Facility;
**FNU DUKES**, Correction Officer at
Bedford Hills Correctional Facility;
**FNU MOSS**, Correction Officer at
Bedford Hills Correctional Facility;
**DUSTIN RUBAINE**, Investigator at New
York State Department of Corrections and
Community Supervision, Office of Special
Investigations;
**CHRISTOPHER NUNEZ**, Investigator at
New York State Department of Corrections

17-CV-7954(RA)

[rel: 16-CV-1473,
 17-CV-1765]

**SECOND AMENDED
COMPLAINT**

<u>**Jury Trial Demanded**</u>

1

and Community Supervision, Office of
Special Investigations;
**STEVEN BROOMER**, Investigator at New
York State Attorney General's Office;
**JOHN DOE #1-2**, Correction Officers at
Bedford Hills Correctional Facility;
**JANE DOE #1-2**, Correction Officers at
Bedford Hills Correctional Facility,

                                        Defendants.

-------------------------------------------------------------------X

Plaintiff **YEKATRINA PUSEPA**, by and through her attorneys, the Law

Offices of Daniel A. McGuinness, PC and the Law Office of Zachary Margulis-

Ohnuma, as and for her complaint, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action brought under 42 U.S.C. § 1983 against

both a correction officer, who violated Plaintiff **YEKATRINA PUSEPA**'s civil rights

by engaging in unlawful sexual activity with her, and against prison officials, who

not only intentionally allowed the conduct to occur, but thereafter punished

Plaintiff by wrongfully committing her to solitary confinement for eight months and

permitting another inmate to brutally attack her. The sexual contact occurred in or

about April 2015, when defendant **RUBEN ILLA** ("**CO ILLA**"), a correction officer

working at Bedford Hills Correctional Facility (hereinafter "BHCF"), sexually

assaulted Plaintiff at BHCF, in Bedford Hills, New York by engaging in sexual

touching with Plaintiff to which she could not give legal consent.

2.      BHCF investigators were aware that Plaintiff was vulnerable to abuse by **CO ILLA** but allowed him to have access to her, including in her housing unit. In effect, in a misguided effort to catch **CO ILLA** in the act, prison officials held Plaintiff out as bait without her consent and with deliberate indifference to her safety.

3.      On December 10, 2015, investigators interviewed Plaintiff about her contact with **CO ILLA**.  She declined to answer questions.  When she did not cooperate, Defendants unlawfully placed her in "administrative segregation" under the pretext of an alleged escape conspiracy that was wholly fabricated.  Altogether, she spent approximately eight months in solitary confinement, locked down in her cell for 23 hours a day and denied access to basic privileges afforded other inmates.

4.      While in segregation, Plaintiff warned guards that she was being threatened by another inmate with a history of violence.  In retaliation for Plaintiff's reporting of the abuse by **CO ILLA**, a correction officer deliberately gave that other inmate access to Plaintiff, knowing the danger posed to Plaintiff. Plaintiff was attacked by the other inmate, who caused injuries to her face, neck and head.

5.      This lawsuit seeks compensatory and punitive damages for the harms caused by Defendants' conduct in using Plaintiff as human bait, sexually assaulting her, unlawfully placing her in solitary confinement, and allowing her to be beaten by another inmate they knew to be violently threatening her.

## JURISDICTION

6.     Subject matter jurisdiction over the federal constitutional issues is proper in this Court pursuant to 28 U.S.C. § 1331. This Court has jurisdiction to order nominal, compensatory and punitive damages, attorneys' fees, and injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. §§ 1983 and 1988.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred inside the Bedford Hills Correctional Facility located in the Southern District of New York.

## PARTIES

8.     Plaintiff **YEKATRINA PUSEPA** is presently a female inmate at Taconic Correctional Facility in Bedford Hills, New York.  From January 2014 to January 2018, Plaintiff was an inmate at BHCF under the operation and control of New York State Department of Corrections and Community Supervision (hereinafter "DOCCS").

9.     Defendant **ANTHONY J. ANNUCCI** ("**COMM'R ANNUCCI**") is the Acting Commissioner of DOCCS.  **COMM'R ANNUCCI** is sued herein in his individual capacity.

10.     Defendant **JASON EFFMAN** ("**COMM'R EFFMAN**") was at all relevant times Associate Commissioner of and Prison Rape Elimination Act (hereinafter "PREA") Coordinator for DOCCS. **COMM'R EFFMAN** is sued herein in his individual capacity.

4

11.   Defendant **A. RODRIGUEZ** ("**DIR RODRIGUEZ**") was at all relevant times Acting Director of Special Housing for DOCCS.   **DIR RODRIGUEZ** is being sued in his individual capacity.

12.   Defendant **SABINA KAPLAN** ("**SUP'T KAPLAN**") was at all relevant times the superintendent of BHCF.   **SUP'T KAPLAN** is being sued in her individual capacity.

13.   Defendants **CAPTAIN ARTUZ** ("**CAPT ARTUZ**") and **MICHAEL DAYE** ("**CAPT DAYE**") were at all relevant times correction officers at BHCF and had the rank of captain.   They are being sued in their individual capacities.

14.   **FNU SPEIGHTS** ("**SGT SPEIGHTS**") was at all relevant times a correction officer at BHCF and had the rank of sergeant.   She is being sued in her individual capacity.

15.   Defendants **M. ALI** ("**CO ALI**"), **FNU DUKES** ("**CO DUKES**"), **RUBEN ILLA,** and **FNU MOSS** ("**CO MOSS**") were at all relevant times correction officers at BHCF.   They are being sued in their individual capacities.

16.   **JOHN DOE #1-2** ("**CO JOHN DOE #1-2**) and **JANE DOE #1-2** ("**CO JANE DOE #1-2**") are pseudonyms for unidentified correction officers at BHCF. They are being sued in their individual capacities.

17.   Defendants **CHRISTOPHER NUNEZ** ("**INV NUNEZ**") and **DUSTIN RUBAINE** ("**INV. RUBAINE**") were at all relevant times investigators for DOCCS Office of Special Investigations (hereinafter "OSI").   They are being sued in their individual capacities.

18.     **STEVEN BROOMER** ("**INV BROOMER**") was at all relevant times an investigator at the New York Attorney General's Office.  He is being sued in his individual capacity.

## FACTUAL ALLEGATIONS

### I.     The Illicit Relationship

19.     From approximately January 2014 to approximately April 2015, Plaintiff was housed in Unit 120B at BHCF.

20.     Plaintiff met **CO ILLA** in September of 2014.  By November of 2014 **CO ILLA** and Plaintiff were frequently passing notes of a sexual nature.

21.     **CO ILLA** was often responsible for escorting groups of inmates to and from the medical station.  On the way back from escorting groups of inmates from medical, **CO ILLA** would loiter in the recreation yard when Plaintiff was in the yard.

22.     **CO ILLA** loitered in the yard for the purpose of congregating with Plaintiff.  **CO ILLA** spent long stretches of time speaking directly with only Plaintiff discussing personal matters.

23.     When **CO ILLA** had long personal conversations with Plaintiff, he did so in full view of two correction officers stationed in the yard who knew that **CO ILLA** had no legitimate reason to be in the recreation yard.

24.     Numerous other correction officers including supervising officers frequently passed through the yard observing **CO ILLA** and Plaintiff having extended one-on-one personal conversations and walking together.

25.     During "movements," which are periods of time when inmates are permitted to move from one area of the facility to another, **CO ILLA** frequently would move to the back porch of 113 building, where he was assigned, for the purpose of speaking with Plaintiff.   **CO ILLA** and Plaintiff would engage in personal one-on-one conversations for the majority of the movement time.   Numerous correction officers and supervising officers frequently passed by Plaintiff and **CO ILLA** while they were having these conversations.

26.     Upon information and belief, multiple correction officers were aware of the inappropriate relationship between **CO ILLA** and Plaintiff.

27.     No official from BHCF or DOCCS took any action to end the inappropriate relationship between **CO ILLA** and Plaintiff.

28.     Certain areas in the recreation yard were known to BHCF's staff and inmates to be unobserved and not visible by any camera.   Plaintiff and **CO ILLA** often met in the recreation yard in these areas.

29.     Once in those areas, known to be outside of the range of any camera, **CO ILLA** would put his arm around Plaintiff's waist and hold her hand.

30.     **CO ILLA** swapped shifts with another correction officer to work at Unit 120B for the purpose of spending more time with Plaintiff.

31.     Unit 120B at BHCF is a dorm that is separated into 50 small cubes. 25 cubes have two inmates housed in them and 25 cubes have single occupancy.

32.     Plaintiff was housed in a double-occupancy cube.

33.     Unit 120B was often guarded by only one correction officer.

34.     Upon information and belief, one of the inmates reported the improper relationship between **CO ILLA** and Plaintiff sometime in or around January 2015.

35.     In exchange for the relationship Plaintiff had with **CO ILLA,** he gave Plaintiff privileges, including: allowing Plaintiff to smoke cigarettes, give tattoos, allow other inmates inside her cube, and be out of place.

36.     In approximately April of 2015, **CO ILLA** asked Plaintiff to get in the shower and let **CO ILLA** see Plaintiff naked.  Plaintiff refused.

37.     A short time later, **CO ILLA** and Plaintiff arranged for **CO ILLA** to come to Plaintiff's cube in private.

38.     Two other inmates held a curtain to hide **CO ILLA** and Plaintiff from view.

39.     **CO ILLA** touched Plaintiff's naked body including her waist and vagina.

40.     **CO ILLA** directly touched Plaintiff's vagina with his hand for approximately a minute.

41.     **CO ILLA** told Plaintiff he wanted to have sex with her.

42.     In approximately May 2015, Plaintiff was transferred to Building 114.

43.     Upon information and belief, **CO ILLA** swapped shifts to work in Building 114 for the purpose of spending more time with Plaintiff.

44.     In approximately August 2015, **CO ILLA** arranged to be alone with Plaintiff in a storage room for the purpose of having sexual intercourse.  Another inmate stood watch to ensure they would not be discovered.  **CO ILLA** became

frightened and left the doorway of the storage room before having intercourse with Plaintiff.  Plaintiff was only in the storage unit for a few minutes.

## II.  The Sham Hearing and SHU Confinement.

45.  On December 2, 2015, Plaintiff was told she had a medical appointment by a correction officer on her unit.  Plaintiff was not aware of any scheduled medical visit but assumed it was a routine check.  Plaintiff reported to the clinic.

46.  **CO ILLA** met with Plaintiff in the clinic waiting area and spoke with her.

47.  Upon information and belief, **CO ILLA** called for Plaintiff to be produced to the medical clinic solely so that **CO ILLA** could spend time with Plaintiff.

48.  Approximately 20 minutes later, non-party BHCF correction officer Sergeant Fusco and two other correction officers entered the clinic waiting area, pulled Plaintiff out of the area and conducted a pat-frisk search on Plaintiff. Nothing was recovered from the search.

49.  Sgt. Fusco told Plaintiff, "Stay away from my officers."

50.  Upon information and belief, Sgt. Fusco made this statement in retaliation against Plaintiff for the improper relationship that **CO ILLA** had cultivated with her.

51.  Plaintiff was then walked back to her cell where she waited for approximately three hours.

9

52.     Plaintiff was then escorted to the interview building and placed in a supply closet for approximately seven hours.  The supply closet was an approximately six-foot-by-six-foot, cold, windowless room.

53.     Plaintiff was then placed in a different room and questioned by **INV RUBAINE**.

54.     **INV RUBAINE** stated to Plaintiff that **INV RUBAINE** knew about the relationship between **CO ILLA** and Plaintiff.

55.     **INV RUBAINE** told Plaintiff that he would "make her time harder" if Plaintiff did not answer him.

56.     Plaintiff refused to answer questions about the relationship between **CO ILLA** and Plaintiff.  As soon as Plaintiff refused to cooperate, **INV RUBAINE** said, "good luck" and Plaintiff was escorted to the Special Housing Unit (hereinafter "SHU").

57.     The SHU is a segregated area of the facility where inmates are held in isolation for 23 hours per day.  While in SHU, among other restrictions, Plaintiff was not allowed access to her belongings, permitted to shower only three times per week, and lost her phone privileges.

58.     Plaintiff was held in SHU pending a hearing.

59.     Plaintiff has since been told that **CO ILLA** was found with a handcuff key.

60.     On December 4, 2015, **CAPT ARTUZ** recommended that Plaintiff be confined to administrative segregation.

10

61.     Inmates can be sent to SHU for two relevant reasons: Disciplinary segregation and administrative segregation.

62.     Disciplinary segregation is designed to discipline an inmate found guilty of a "Tier III" violation, the most serious of three infractions levels in the DOCCS system.  A disciplinary segregation term lasts for designated period of time as specified by the hearing officer.  Once that time elapses, the statute does not empower DOCCS to punish the inmate further for the same infraction.

63.     Administrative segregation removes an inmate from the general population when she poses a threat to the safety and security of the prison security.  Administrative segregation terms are open-ended and do not require that DOCCS predetermine when it will release an inmate.

64.     **CAPT ARTUZ** alleged that a confidential letter, the finding of a cuff key, and results from a confidential investigation supported a finding that Plaintiff had "conspired to escape" from BHCF.

65.     In reality, **CAPT ARTUZ** knew that Plaintiff was not aware of any plan, conspiracy or attempt to escape from BHCF, and that no such plan existed.

66.     **CO ILLA** filed a false statement charging Plaintiff with being "out of place" when in fact **CO ILLA** himself summoned Plaintiff to medical.  **CO ILLA** filed this false report to cover up his relationship with Plaintiff.

67.     **CO ILLA's** complaint was known by prison officials and OSI investigators to be false and was not a part of the administrative segregation hearing that followed.

11

68.     Upon information and belief, **CO ILLA** has since been arrested for and pled guilty to offering a false instrument for filing in the first degree (New York Penal Law § 175.35) because of the false report he filed against Plaintiff.

69.     An administrative segregation hearing, conducted by **CAPT DAYE**, commenced at BHCF on December 10, 2015.  Plaintiff pleaded not guilty to the charge of conspiracy to escape.

70.     **CAPT ARTUZ** was the first witness called at Plaintiff's hearing.  He refused to disclose any information whatsoever about a confidential letter and the confidential investigation that formed the basis of the charge.  **CAPT ARTUZ** did disclose, however, that the cuff key was not found among Plaintiff's property and was never alleged to have been in her possession.

71.     **CAPT DAYE** told Plaintiff he would obtain confidential testimony and then disclose to Plaintiff what he could.  **CAPT DAYE** also said Plaintiff could write down questions that he would ask on Plaintiff's behalf outside of Plaintiff's presence.  Plaintiff wrote questions to be asked by **CAPT DAYE**.

72.     When the hearing resumed, **CAPT DAYE** told Plaintiff that he had posed Plaintiff's questions to **CAPT ARTUZ**, but that the answers would remain confidential.

73.     **CAPT DAYE** informed Plaintiff that **CAPT ARTUZ** admitted that the cuff key was never in Plaintiff's possession. Furthermore, **CAPT ARTUZ** was unaware if Plaintiff even knew about the cuff key.

74.     **INV RUBAINE** also offered testimony against Plaintiff at the hearing. Plaintiff posed questions to **INV RUBAINE** but **CAPT DAYE** deemed the answers confidential and did not disclose the answers to Plaintiff.

75.     **INV RUBAINE** also testified on the non-confidential record. **INV RUBAINE** hinted at evidence that Plaintiff might have had knowledge of the cuff key but refused to provide any further information or answer any of Plaintiff's questions about her alleged conspiracy to escape.

76.     The only substantive testimony by **INV RUBAINE** was that to his knowledge, the confidential letter was not written by Plaintiff. **INV RUBAINE** also stated that other letters were found in Plaintiff's Bible in her cell.

77.     Plaintiff is familiar with the letters found inside her Bible.  They contained no information related to any escape plans, conspiracy or attempt.  The personal letters were not correspondence with **CO ILLA**.

78.     Plaintiff testified that the allegations against her were completely surprising to her and fabricated.  Plaintiff testified that conspiracy requires involvement with another person, but she did not know anyone planning or facilitating an escape.

79.     Plaintiff emphasized that she had no reason to jeopardize her sentence as her conditional release date is in 2019.

80.     At the end of the hearing Plaintiff made several objections.  Plaintiff objected to the failure to provide her with documentary evidence and the fact

Plaintiff was unable to hear the contents of the confidential letter, which prevented her from disputing the allegations against her.

81.    Petitioner further objected to the lack of evidence of her knowledge of the cuff key and wanted to know what evidence was relied upon to support she was in agreement with someone to escape.

82.    The hearing concluded on January 5, 2016.  In his hearing determination, **CAPT DAYE** issued a disposition in favor of the administrative segregation recommendation, which stated "admit to admin seg."  Evidence **CAPT DAYE** relied upon included the recommendation of **CAPT ARTUZ**, both the confidential and non-confidential testimony of **CAPT ARTUZ** and **INV RUBAINE**, the confidential letter, and Plaintiff's testimony.

83.    In this case, the challenged disposition could have kept Plaintiff in isolation until the maximum expiration date of her sentence, which on information and belief is November 5, 2020.

### III.    Coercive Continued SHU Confinement

84.    On January 7, 2016, Plaintiff submitted an administrative appeal in which Plaintiff argued that the lack of non-confidential evidence prevented her from disputing the evidence against her; the failure to provide Plaintiff with adequate notice impaired her ability to defend herself; and that no proof of her alleged conspiracy to escape existed.

14

85.     In or about February of 2016, **INV RUBAINE** visited Plaintiff in the SHU, and told her that if she cooperated with the investigation, he would help her get out of SHU.  Plaintiff declined to cooperate with the investigation.

86.     On March 3, 2016, **DIR RODRIGUEZ**, wrote that he reviewed and affirmed the hearing disposition.

87.     **DIR RODRIGUEZ** did not, in fact, conduct any meaningful review of the hearing evidence.

88.     In or about March of 2016, **INV RUBAINE** again visited Plaintiff in the SHU.  **INV RUBAINE** asked Plaintiff to cooperate with the investigation.

89.     During that visit, **INV RUBAINE** told Plaintiff that, as early as January 2015, **INV RUBAINE** and others had known about **CO ILLA**'s inappropriate relationship with Plaintiff.

90.     Upon information and belief, from approximately January 2015 until December 2015, **INV RUBAINE**, **INV NUNEZ**, **SUP'T KAPLAN** and others deliberately allowed **CO ILLA** access to Plaintiff in the hopes that they would catch them engaged in improper activity.  In other words, Plaintiff was used as bait in their investigation.

91.     Later in or about March of 2016, **INV NUNEZ** visited Plaintiff in the SHU.

92.     At that visit, **INV NUNEZ** told Plaintiff that if Plaintiff cooperated and wrote out a statement he would help her get out of SHU.

15

93.     Desperate to get out of SHU, Plaintiff agreed to write a statement, but attempted to protect **CO ILLA** and did not include the sexual contact.

94.     In or about April of 2016, **INV RUBAINE** again visited Plaintiff in SHU.

95.     At that visit, **INV RUBAINE** sought a more detailed and full statement from Plaintiff.  **INV RUBAINE** told her that the administrative segregation was now "over his head" but he would talk to someone to see what he could do, if she wrote out a more detailed statement.

96.     **INV RUBAINE** also told Plaintiff that **CO ILLA** was getting married and having a baby.

97.     On or about April 13, 2016, **SUP'T KAPLAN** wrote Plaintiff stating that **SUP'T KAPLAN** had performed a 60-day review of Plaintiff's administrative segregation, and that Plaintiff would remain in administrative segregation.

98.     **SUP'T KAPLAN** had not conducted a meaningful 60-day review.

99.     **SUP'T KAPLAN** knew that Plaintiff posed no danger to any inmate, staff or the facility.

100.    Rather, **SUP'T KAPLAN** was working with **INV NUNEZ** and **INV RUBAINE** to coerce Plaintiff into cooperating with their investigation.

101.    In or about May of 2016, **INV RUBAINE** again visited Plaintiff in the SHU.

102.    At that visit, Plaintiff gave a more detailed statement but still did not include the sexual contact to protect **CO ILLA**.

16

103.    On May 23, 2016, Plaintiff filed an Article 78 action challenging the legality of her administrative segregation in New York Supreme Court, Albany County, Index No. 2505/2016.

104.    On or about June 10, 2016, **INV RUBAINE** along with **INV BROOMER** visited Plaintiff in SHU.

105.    At that visit, **INV RUBAINE** and **INV BROOMER** interviewed Plaintiff about **CO ILLA**.  **INV BROOMER** stated that if Plaintiff agreed to testify against **CO ILLA**, **INV BROOMER** would help her to be transferred out of administrative segregation.

106.    At that visit, Plaintiff wrote a full written statement including the details of the sexual contact and gave it to **INV BROOMER** and **INV RUBAINE**.

107.    The statement was approximately 11 hand-written pages.

108.    On or about July 5, 2016, **INV RUBAINE** visited Plaintiff in SHU and told her that he had spoken to **SUP'T KAPLAN** and that it was time for her to be released.  Plaintiff was then transferred out of administrative segregation.

109.    Plaintiff later received a letter from **DIR RODRIGUEZ** that the hearing determination had been administratively reversed on July 5, 2016.

110.    **DIR RODRIGUEZ**, **SUP'T KAPLAN**, **CAPT ARTUZ**, **CAPT DAYE**, **INV BROOMER**, **INV NUNES**, and **INV RUBAINE.** knew that evidence did not exist to conclude that Plaintiff knew of any plan, conspiracy or attempt to escape from BHCF, nor did they have reason to belief that Plaintiff knew of any plan, conspiracy or attempt of **CO ILLA** to facilitate an escape.

17

111.    No reasonable basis existed to sentence Plaintiff to administrative segregation, or continue her confinement therein.

112.    Plaintiff initially refused to assist the investigation.

113.    Upon information and belief, **SUP'T KAPLAN**, **CAPT ARTUZ**, **CAPT DAYE**, **INV BROOMER**, **INV NUNES**, and **INV RUBAINE**, conspired together to place Plaintiff in administrative segregation and keep her there for the purpose of pressuring her to cooperate with their investigation of Plaintiff's relationship with **CO ILLA**.

114.    This tactic was used to force Plaintiff to discuss the intimate details of her abuse.

115.    These actions constituted punishment of Plaintiff for being a victim of sexual abuse.

116.    Plaintiff remained in isolation for nearly eight months.

117.    This long period of solitary confinement caused Plaintiff to suffer substantial psychological and physical harm.

## IV.    The Assault in SHU.

118.    When Plaintiff was arriving at SHU, **CO ALI** told Plaintiff that the correction officers knew about her relationship with **CO ILLA**.  While Plaintiff was in SHU, **CO ALI** and others talked openly about this relationship.  The officers taunted Plaintiff saying that they would have cooperated against **CO ILLA** rather than go to SHU.

119.   While in segregation, Plaintiff was permitted recreation time with other inmates.

120.   One such inmate, K.W., had learned of Plaintiff's relationship with **CO ILLA** and taunted Plaintiff about the relationship.

121.   K.W. threatened to harm Plaintiff.

122.   Upon information and belief, K.W. had learned of the relationship via the conversations and remarks by the correction officers.

123.   K.W. was known to be violent at BHCF.

124.   At the time, K.W. was in SHU for a sanction involving assault on staff. K.W. also had a previous history of assaultive behavior.

125.   Plaintiff promptly reported the threat to BHCF's PREA Compliance Manager and **CAPT ARTUZ**.

126.   On June 6, 2016, an order was made in the SHU logbook that Plaintiff was to "REC ALONE."

127.   This notation meant that Plaintiff was to only be given recreation time alone, without other inmates present.

128.   The purpose of this notation was to protect Plaintiff from the specific threat posed by K.W.

129.   Upon information and belief, **CO ALI** was briefed on the prior incident between K.W. and Plaintiff, and knew that the notation in the logbook was made because of the threat to Plaintiff's safety from K.W.

130.   **CO ALI** knew that K.W. was violent and that allowing K.W. into the recreation yard with Plaintiff would present a serious threat to Plaintiff's safety.

131.   On June 9, 2016, despite the order to "<u>REC ALONE</u>," **CO ALI** deliberately disregarded the order in the logbook and allowed K.W. into the recreation yard with Plaintiff.

132.   The inmate attacked Plaintiff causing injuries to Plaintiff.

133.   Plaintiff suffered injuries to the face, head, neck and arm.

134.   Plaintiff was placed in the infirmary for observation.

135.   Even though Plaintiff only acted to defend herself, and had previously warned of the threat, Plaintiff was disciplined for fighting.

136.   Plaintiff successfully challenged the disciplinary action and had it expunged.

137.   On or about June 14, 2016, Plaintiff filed a grievance against **CO ALI** for putting Plaintiff in the recreation yard with K.W. despite the order that Plaintiff was to "<u>REC. ALONE</u>."

138.   To date, Plaintiff has not received notice of the resolution of the grievance, despite repeated attempts to follow up on its status.

### V.   The Assault by CO Moss

139.   On or about July 2017, an event was being held in the recreation yard at BHCF.

20

140. During the set-up for that event, **CO MOSS** approached Plaintiff and loudly said to another correction officer, in front of other correction officers and inmates, "This is the bitch messing with **CO ILLA**."

141. Plaintiff's friend, a fellow inmate, Melissa Cotton, reported the incident to **SGT SPEIGHTS**.

142. Upon information and believe, **SGT. SPEIGHTS** did nothing to intervene on Plaintiff's behalf.

143. Later during the event in the recreation yard, **CO MOSS** continued to verbally harass Plaintiff, following her around the yard and yelling obscenities into Plaintiff's face.

144. Upon information and belief, none of the correction officers or staff present at the event did anything to intervene on Plaintiff's behalf.

145. After the conclusion of the event, Plaintiff was cleaning up when **CO MOSS** again approached her.

146. **CO MOSS** then turned off her body camera and approached within inches of Plaintiff's face, where she continued to scream at Plaintiff and threatened to fight her by saying, "I say what I wanna say. We can do this anywhere." As **CO MOSS** screamed this, she repeatedly punched her hand with a closed fist indicating that she intended to strike Plaintiff.

147. Other correction officers, including **CO DUKES**, **CO JOHN DOE #1**, **CO JOHN DOE #2**, **CO JANE DOE #1**, and **CO JANE DOE #2** formed a circle

21

around Plaintiff and **CO MOSS** to confine Plaintiff in close proximity with **CO MOSS** and to witness the fight, and did nothing to intervene on Plaintiff's behalf.

148.    Inmate Melissa Cotton then entered the circle, removed Plaintiff, and escorted her out of the recreation yard and back into the facility.

149.    Upon information and belief, **SGT SPEIGHTS** had a full view of the yard and witnessed the entire incident but did not intervene.

150.    Upon information and belief, **SGT SPEIGHTS**, **CO MOSS**, and **CO DUKES** were suspended for their inappropriate behavior toward Plaintiff.

151.    Plaintiff suffered severe emotional distress, psychological harm, and trauma as a result of the attempted attack on her by **CO MOSS** and the complicity of **SGT SPEIGHTS**, **CO DUKES**, **CO JOHN DOE #1**, **CO JOHN DOE #2**, **CO JANE DOE #1**, and **CO JANE DOE #2**

**VI.    COMM'R ANNUCCI, COMM'R EFFMAN, and SUP'T KAPLAN by their Actions and Failure to Act Created an Environment at BHCF Where Sexual Abuse was Frequent, and Retaliation Against Inmate Victims Who Complained was Commonplace.**

**A.    COMM'R ANNUCCI, COMM'R EFFMAN, and SUP'T KAPLAN Are Responsible for Preventing Sexual Abuse and Retaliatory Actions Against Victims at BHCF.**

152.    **COMM'R ANNUCCI** was at all relevant times responsible for enacting policies and procedures to protect the safety of inmates incarcerated in DOCCS and ensuring that the policies and practices are enforced in DOCCS facilities.

153.    The United States Department of Justice ("DOJ") regulation at 28 C.F.R. § 115.11(b) requires an agency to employ or designate an upper-level,

22

agency-wide PREA coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with PREA standards in all its facilities.  Upon information and belief, **COMM'R EFFMAN** was at all relevant times the individual charged with these responsibilities for DOCCS.

154.   **SUP'T KAPLAN** was at all relevant times responsible for the safety of the inmates at BHCF.  **SUP'T KAPLAN** was at all relevant times responsible for creating and enforcing policies and practices that ensure the safety of the inmates at BHCF.

155.   **SUP'T KAPLAN** failed to implement policies or procedures to protect inmates from sexual abuse at BHCF. Despite repeated instances of officer sexual abuse of inmates, and retaliatory actions upon the victims, **SUP'T KAPLAN** failed to discipline officers or otherwise enact or enforce policies to correct the pervasive custom of abuse at BHCF.

### B.   COMM'R ANNUCCI, COMM'R EFFMAN, and SUP'T KAPLAN were aware of the Substantial Risks of Sexual Abuse to Female Prisoners Generally, in DOCCS Facilities and Particularly in BHCF.

156.   **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** were aware that risk and incidence of sexual abuse in a prison setting led the federal government, the District of Columbia, and all fifty states to enact statutes criminalizing any sexual contact between prisoners and correctional staff.

157.   **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** were aware that in New York the risk and incidence of sexual abuse in a prison setting led to the criminalization of any sexual contact between prisoners and correctional

staff in the enactment of N.Y. Penal Law § 130.05(3)(e), which states that an inmate committed to the care and custody of DOCCS is incapable of giving consent.

158.   **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** were aware that the risk of custodial sexual abuse led to the enactment of PREA in 2003.

159.   For a number of reasons and from a variety of sources, **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** were aware that assigning male staff to guard female prisoners creates obvious risks of sexual abuse.

160.   Upon information and belief, **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** were aware that the risk and incidence of sexual abuse in a prison setting led to the promulgation of international standards prohibiting the assignment of male correctional staff to guard women prisoners. United Nations Standard Minimum Rules for the Treatment of Prisoners, Rule 53, adopted Aug. 30, 1955.

161.   Upon information and belief, **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** were aware that the risk and incidence of sexual abuse in a prison setting, including the particular risks facing women prisoners, led several states and local correctional institutions to require the presence of female staff to guard women prisoners, and even to remove men from guarding women prisoners, at least in housing areas.

162.   Upon information and belief, **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** were aware that women prisoners were a particularly vulnerable population who faced a heightened risk of sexual abuse by

male officers. As many as 80% of women prisoners have been physically or sexually abused prior to their incarceration.   A larger number of incarcerated women have histories of sexual and physical abuse than male prisoners or women who have never been incarcerated.   These abuse histories make women especially vulnerable to coercion and manipulation.

163.   In addition to awareness based on the ample information regarding the problem of staff sexual abuse in correctional settings generally, **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** were aware of the substantial risk to women prisoners of sexual misconduct by male staff in New York facilities given DOCCS' own actual experience, particularly because DOCCS knew that sexual abuse is significantly under-reported in the prison context.  Upon information and belief, **COMM'R ANNUCCI** and **COMM'R EFFMAN** are aware that OSI receives approximately 200 complaints of staff sexual misconduct and harassment each year.

164.   The DOJ's Bureau of Justice Statistics periodically releases reports of anonymous surveys on sexual victimization in prisons and jails.  The last time that women prisoners in New York were included in the survey, New York State prisoners self-reported the highest rates of staff sexual abuse in the nation.

165.   Upon information and belief, **COMM'R ANNUCCI, COMM'R EFFMAN,** and **SUP'T KAPLAN** were aware that in 2012, 78 investigations were opened by the OSI's Sex Crimes Unit ("SCU") into sexual misconduct involving

DOCCS staff at the all-women's prisons, which currently include Albion, BHCF, and Taconic.  In 2013, 61 such investigations were opened.

166.    Numerous instances of staff sexual misconduct at BHCF by officers have resulted in criminal charges.  **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** were aware of at least the following instances that resulted in criminal actions against BHCF staff:

a.    In 2009, David Sawyer, a sergeant at BHCF, pleaded guilty to third-degree rape of an inmate.

b.    In 2010, Fredrick Brenyah, a correction officer at BHCF, was convicted of attempted rape of an inmate.

c.    In July of 2014, Kevin R. Fields, a correction officer at BHCF, was arrested and charged with third degree rape of an inmate.

d.    In October of 2014, Richard Rodriguez, a correction officer at BHCF, pled guilty to third-degree rape.

e.    In December of 2014, Jose Guzman, a correction officer at BHCF, was arrested and charged with the rape of an inmate.

f.    In August of 2015, Ruben Garcia, a correction officer at BHCF, was arrested and charged with the rape of an inmate.

g.    In December of 2015, Rasheen Smalls, a correction officer at BHCF, was arrested and charged with the rape of an inmate.

167.     Upon information and belief **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** were aware that there had been at least seven pregnancies of DOCCS inmates conceived with DOCCS staff since 2000.

168.     **COMM'R ANNUCCI** and **COMM'R EFFMAN** have been party to a number of injunctive and damages cases brought in both state and federal courts by women prisoners who have been victims of staff sexual abuse. The cases include the putative class action litigation *Amador v. Andrews*, which was brought on behalf of 17 named plaintiffs in 2003. *See* Case No. 03 Civ. 0650 (S.D.N.Y. 2003). In more than a decade during which that case was pending, there were several motions to amend the Complaint to add new named plaintiffs and identify policy failures to reflect the ongoing sexual abuse problem within DOCCS.

169.     Upon information and belief, **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** knew that cases that result in criminal prosecutions or the discipline of staff do not reflect the entire universe of staff misconduct, given that only reported incidents of sexual misconduct, harassment, and abuse are investigated, and **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** knew that staff sexual abuse is significantly underreported.

170.     Victims of sexual abuse, generally, are unlikely to come forward with complaints of sexual misconduct due to embarrassment and humiliation and a fear that such complaints will be greeted with skepticism or disbelief.

171.     These concerns are exacerbated in a correctional setting, where the persons to whom such complaints are to be made are colleagues of the perpetrators of

the abuse, putting the victim at risk of retaliation; where complaints of such abuse are not maintained in a confidential fashion; and where there is a well-founded belief by women prisoners that such complaints will be greeted with skepticism and will not result in any action against the perpetrator.

172.     The failure of **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** to implement and enforce policies and practices that would actually prevent and punish all sexual abuse contributed to a lenient and permissive prison culture and increases the risk of sexual abuse of women prisoners.

173.     Some of the abuse that took place in BHCF was deemed by staff to be "consensual." In other words, the inmates were not necessarily subjected to physically forcible abuse, but rather appeared to enter into sexual contact voluntarily. However, any purportedly "consensual" sexual activity between correctional staff and the prisoners they are paid to guard and control is a fallacy, regardless of the "willingness" of the prisoner. Consent in such circumstances is non-existent under the law, as nearly every state legislature in the United States has recognized. Purportedly "consensual" sexual activity between inmates and officers does not resemble actual "consent" as it might exist outside of the prison context.

      C.     **COMM'R ANNUCCI, COMM'R EFFMAN, and SUP'T KAPLAN Failed to Enact Supervisory Policies that Would Prevent Sexual Abuse by Male Staff and Failed to Enforce Existing Policies**

174.     Despite known risks and frequent incidents of sexual misconduct by staff, **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN**, through their

policies and practices (or lack thereof) recklessly disregarded these risks and failed to protect the women prisoners in their custody from harm.

175.     **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** inadequately supervised correctional staff, placing women prisoners at a heightened risk of sexual abuse.

176.     **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** failed to enact appropriate rules and policies concerning the behavior of male staff and failed to enforce existing rules and policies governing staff behavior.

177.     Despite knowledge of the risk of sexual abuse in women's prisons, **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** permitted the assignment of male staff, including **CO ILLA**, to posts on which they have ample opportunity for unmonitored contact with women prisoners.

178.     **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** supervised male staff guarding female prisoners no differently from the way they would supervise same-gender supervision of men.

179.     Male staff, including **CO ILLA**, were assigned, alone, to areas where no other staff are within range for visual contact.  This includes assignments that cover remote or isolated areas not monitored by video surveillance and even overnight shifts in housing areas

180.     While Plaintiff resided in Unit 120B, **CO ILLA** routinely was the only officer for the unit, which allowed him ample opportunity to coerce Plaintiff into an

improper relationship.  **CO ILLA** was unsupervised as he used his position of authority to manipulate Plaintiff into the relationship.

181.     Upon information and belief, **SUP'T KAPLAN** allowed male correctional staff, including **CO ILLA**, to choose ("bid for") their own assignments without regard to the number or severity of allegations of sexual misconduct that had been made by women prisoners about them.

182.     Officers only had to agree amongst themselves when to swap shifts or assignments.

183.     **CO ILLA** used this policy to transfer to shifts first to Unit 120B, then Unit 114 to spend time with Plaintiff, and coerce her into engaging in sexual contact with him.

184.     **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** failed to enact adequate rules and policies to monitor and discipline staff engaged in behavior that constitutes warning signs of sexual abuse, such as spending a disproportionate amount of time talking to a particular prisoner, repeatedly requesting a particular prisoner for a particular assignment, discussing their personal life with a prisoner, or asking a prisoner personal question.  Staff were not disciplined or informally counselled when supervisors witnessed behavior that is indicative of warning signs of sexual abuse

185.     **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** additionally created a culture and custom of ignoring staff-inmate relationships by

failing to investigate or discipline any BHCF officers who knew of improper relationships between correction officers and inmates.

186.     Upon information and belief, none of the listed at ¶ 166 resulted in investigations or disciplinary action against staff members who knew about the improper relationships but failed to report them.

187.     **CO ILLA** engaged in direct and inappropriate contact with Plaintiff for months. Numerous correction officers and supervisors observed the inappropriate contact between **CO ILLA** and Plaintiff but did not take action to stop it, because it was the custom and unspoken policy of BHCF to turn a blind eye to such conduct

188.     **COMM'R ANNUCCI, COMM'R EFFMAN,** and **SUP'T KAPLAN** have failed to take sufficient action when officers leave their assigned posts, allow inmates into areas where inmates are not permitted, ask women to volunteer or work on jobs to which they have not been formally assigned, and engage in open and obvious behavior that is clearly suggestive of inappropriate relationships.

189.     **CO ILLA** frequently left his assigned work area to spend time with Plaintiff.

190.     **CO ILLA** was never reported, disciplined or reprimanded since his was permissible under the custom and policy of BHCF.

191.     **COMM'R ANNUCCI, COMM'R EFFMAN**, and **SUP'T KAPLAN** failed to require and conduct reasonable searches of correctional staff upon entry to correctional facilities that could help prevent or discourage sexual abuse or ultimately assist in the investigation of allegations of staff sexual misconduct.  The failure to catch

correctional staff with contraband such as drugs and alcohol, or to limit entry of condoms, cell phones, notes, and other personal items allows officers the opportunity to use these items to influence, coerce, or otherwise manipulate prisoners into performing sexual acts and limits the evidence that could be used in investigations of staff sexual misconduct.

192.     **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** failed to promulgate policies that provided for additional rounds to more closely supervise staff about whom complaints of sexual abuse had been made.

193.     Staff who were the subject of credible or repeated allegations of sexual abuse were allowed to continue their usual posts and permitted to access private, unmonitored areas.  They were even permitted to continue to guard or to have contact or proximity with the prisoner who has complained about the officer.

194.     To the extent **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** installed or required installation of surveillance cameras, use of those cameras for supervision was, at all relevant times, grossly inadequate to protect women prisoners.

195.     Surveillance cameras were not installed throughout BHCF.  Many enclosed and isolated areas inside the prison, or isolated areas outside the prison, where sexual abuse is more likely to occur, or has been reported to have occurred, are completely outside of any video or audio surveillance.  These areas included storage closets, laundry rooms, slop sink areas, sheds, outside work areas, and basements.

196.     For areas for which there were privacy concerns, like bathrooms, living areas, and religious program areas, **COMM'R ANNUCCI, COMM'R EFFMAN,** and **SUP'T KAPLAN** permitted officers virtually unfettered access to private, unmonitored areas such as bathrooms, kitchen store rooms, storage closets, slop sink areas, basements, classrooms, laundry areas, and private areas of prison yards. At the same time, **COMM'R ANNUCCI, COMM'R EFFMAN,** and **SUP'T KAPLAN** failed to prohibit officers from being alone with women prisoners in such areas where sexual abuse of women prisoners is easily accomplished.  When instances of staff sexual misconduct were substantiated, they were often found to have occurred in these isolated, and largely unmonitored, areas.

197.     It was widely known in BHCF among the inmates and staff that certain areas in the recreation yard described above were not monitored.

198.     **SUP'T KAPLAN** took no action to discover these blind spots or encourage staff to report them.

199.     It was the policy and custom of BHCF to not remedy such blind spots, and to allow officers essentially unlimited access to such areas.

200.     Upon information and belief, camera placement was not informed or increased upon receipt of multiple credible complaints of or other knowledge of abuse occurring in particular areas or by particular staff assigned to a particular area.

201.     **CO ILLA** took advantage of the lack of cameras in Unit 120B and in the recreation yard to further his manipulation of Plaintiff.  The lack of cameras in those areas allowed **CO ILLA** to advance his improper relationship.

33

202.    Upon information and belief, **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** failed to enact and enforce adequate rules and policies that dictated the content and substance of limited supervisory rounds.

203.    Upon information and belief, facility supervisory rounds consisted of merely stopping by the assigned line officers' desk or office, signing the logbook and nothing more.

204.    Upon information and belief, there was no requirement that supervisory staff must see each officer on duty, check in verbally with each officer, ask the officers any particular questions, speak with the prisoners on a housing unit or program assignment, or ask them if they have problems, or that they observe the entire area, the prisoners and the staff, for any misconduct, or make any notations on what they observe.

205.    Upon information and belief, supervision did not include observation and counselling or discipline for officers engaged in behavior evincing warning signs of sexual abuse, including engaging in personal conversations with inmates, sharing personal items with inmates, or repeatedly requesting a particular inmate for special assignments in secluded locations.

206.    Upon information and belief, **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** failed to require a set number and frequency of supervisory rounds by most supervisory officers.  Only rounds by the Superintendent and her executive team were required at a specified frequency, and that is only once a week, with no other written policies and procedures directing the frequency and

regularity of rounds.  In practice, sergeants typically visit each post once or twice per shift.

207.     **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** failed to require unpredictable supervisory rounds.  Facility supervisors routinely conducted rounds in a predictable manner, failing to vary their time, frequency, and point of entry, leaving staff able to predict periods of time, such as the time around shift change or after a supervisor has passed through, when they can virtually be assured that they can engage in misconduct with women prisoners without being discovered.

208.     When guarding Plaintiff in Unit 120B, **CO ILLA** knew that a supervisor made rounds twice per shift, one time at around 9:00am and the another between 1:00pm and 2:00pm.

209.     This lack of supervision enabled **CO ILLA** to be confident that he would not be interrupted as he continued to engage in improper conduct and manipulate Plaintiff into an illicit relationship.

## FIRST CAUSE OF ACTION

### CRUEL AND UNUSUAL PUNISHMENT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (Against CO ILLA)

210.     Paragraphs 1 – 209 are hereby incorporated and realleged.

211.     In touching Plaintiff's vagina while she was nude in or about March 2015, **CO ILLA** acted willfully and wantonly for his own sexual gratification.

212.     There was no penological justification for **CO ILLA**'s conduct.

213.    **CO ILLA**'s conduct was unreasonable and in violation of Plaintiffs' clearly established constitutional right to be free from cruel and unusual punishment.

214.    **CO ILLA**'s conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

## SECOND CAUSE OF ACTION

### DELIBERATE INDIFFERENCE
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (Against COMM'R ANNUCCI,
### COMM'R EFFMAN, and SUP'T KAPLAN)

215.    Paragraphs 1 – 214 are hereby incorporated and realleged.

216.    **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN**, were aware that male correction officers at BHCF were repeatedly accused, charged and criminally convicted of sexually abusing female inmates.

217.    **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN**, failed to implement and enforce policies sufficient to protect inmates at BHCF from sexual abuse by correction officers.

218.    **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN** created a custom and unspoken policy, through their actions and failures to act, in which BHCF staff turned did not report and turned a blind eye to warning signs of improper relationships and manipulation of inmates by correction officers.

219.    **COMM'R ANNUCCI**, **COMM'R EFFMAN**, and **SUP'T KAPLAN**, were deliberately indifferent to a serious risk to the safety of all female inmates at the hands of male correction officers at BHCF.

<u>THIRD CAUSE OF ACTION</u>

**DELIBERATE INDIFFERENCE**
**VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII**
**(Against INV RUBAINE, INV NUNEZ, and SUP'T KAPLAN)**

220.     Paragraphs 1 – 219 are hereby incorporated and realleged.

221.     As early as January 2015, **INV RUBAINE** was aware of the improper relationship between Plaintiff and **CO ILLA**. **INV RUBAINE** told Plaintiff that "others" had also been aware of the relationship at that time.

222.     Upon information and belief, those "others" include **INV NUNEZ**, the OSI investigator who worked with **INV RUBAINE** on the investigation, and **SUP'T KAPLAN**, who operated the facility where the investigation took place.

223.     **INV RUBAINE, INV NUNEZ** and **SUP'T KAPLAN** allowed the illicit relationship to continue in order to gather evidence against **CO ILLA**. **INV RUBAINE, INV NUNEZ**, and **SUP'T KAPLAN** permitted the relationship to continue without notifying Plaintiff.

224.     **INV RUBAINE, INV NUNEZ**, and **SUP'T KAPLAN** were aware that **CO ILLA** had frequent access to Plaintiff and supervisory control over her due to his position as a correction officer. **INV RUBAINE, INV NUNEZ**, and **SUP'T KAPLAN** were deliberately indifferent to the imminent risk of sexual abuse by **CO ILLA** upon Plaintiff prior to the sexual contact that eventually did occur.

<u>FOURTH CAUSE OF ACTION</u>

**CONSPIRACY AND AIDING AND ABETTING THE DENIAL OF DUE PROCESS**
**IN VIOLATION OF U.S. CONSTITUTION AMENDMENT XIV**
**(Against SUP'T KAPLAN, DIR RODRIGUEZ,**
**CAPT ARTUZ, CAPT DAYE, INV NUNEZ**

INV BROOMER and INV RUBAINE)

225.     Paragraphs 1 – 224 are hereby incorporated and realleged.

226.     **SUP'T KAPLAN**, **DIR RODRIGUEZ, CAPT ARTUZ, CAPT DAYE, INV BROOMER, INV NUNEZ** and **INV RUBAINE** conspired, agreed, aided and abetted each other and effected the coercion of Plaintiff to provide information against **CO ILLA**, and to punish Plaintiff for her relationship with **CO ILLA**.

227.     As an inmate, Plaintiff could not legally consent to any sexual touching.

228.     **CO ILLA**'s sexual contact with Plaintiff constituted sexual assault in violation of the New York Penal Law and other authorities.

229.     **SUP'T KAPLAN**, **DIR RODRIGUEZ, CAPT ARTUZ, CAPT DAYE, INV BROOMER, INV NUNEZ** and **INV RUBAINE** knew that Plaintiff could not legally be punished for her relationship with **CO ILLA** since Plaintiff was the victim.

230.     **SUP'T KAPLAN**, **DIR RODRIGUEZ, CAPT ARTUZ, CAPT DAYE, INV BROOMER, INV NUNEZ** and **INV RUBAINE** agreed to designate Plaintiff to administrative segregation as a pretext for SHU detention until she cooperated in their investigation of **CO ILLA**.

231.     **SUP'T KAPLAN**, **DIR RODRIGUEZ, CAPT ARTUZ, CAPT DAYE, INV BROOMER, INV NUNEZ** and **INV RUBAINE** conspired to deprive Plaintiff of her Due Process rights by confining Plaintiff to isolation without procedural or substantive Due Process.

232.     Plaintiff was entitled to a fair and impartial hearing before being confined to administrative segregation for an extended period.

233.     The hearing against Plaintiff was not fair and impartial but was a pretext to coerce Plaintiff's cooperation in the investigation.

234.     The hearing was knowingly based upon false and fabricated information.

235.     Plaintiff was entitled to a meaningful review of her administrative segregation status every 60 days.

236.     No meaningful review of her administrative segregation status was conducted.

237.     No evaluation of whether justification for Plaintiff's continued administrative segregation was actually ever performed.

238.     Upon information and belief, **CO ILLA** was not present in at BHCF at any time during Plaintiff's time in administrative segregation, and no threat of any escape plot existed.

239.     **SUP'T KAPLAN**, **DIR RODRIGUEZ, CAPT ARTUZ, CAPT DAYE, INV BROOMER, INV NUNEZ** and **INV RUBAINE** knew that no credible information of any escape plot involving Plaintiff existed, and that there was no lawful or legitimate reason to hold Plaintiff in administrative segregation.

240.     **SUP'T KAPLAN**, **CAPT ARTUZ**, **CAPT DAYE**, **INV BROOMER**, and **INV RUBAINE** entered into this conspiracy for the purpose of punishing Plaintiff for

her relationship with **CO ILLA**; and to coerce Plaintiff to cooperate into their

investigation of **CO ILLA**.

241.     As a result of this conspiracy, Plaintiff was held in isolated

confinement for nearly eight months and suffered severe physical, psychological and

emotional distress.

## FIFTH CAUSE OF ACTION

**DENIAL OF DUE PROCESS
VIOLATION OF U.S. CONSTITUTION AMENDMENT XIV
(Against SUP'T KAPLAN, DIR RODRIGUEZ,
CAPT ARTUZ, CAPT DAYE, INV. NUNEZ
INV BROOMER and INV RUBAINE)**

242.     Paragraphs 1 – 241 are hereby incorporated and reallaged.

243.     **CAPT ARTUZ** recommended Plaintiff be placed in administrative

segregation as retaliation for Plaintiff's refusal to cooperate in the investigation of **CO

ILLA**.  **CAPT ARTUZ** knew that Plaintiff was not a threat to the security of the facility

and intended to have Plaintiff confined to administrative segregation as pretext for

punitive reasons, and to coerce her.

244.     **INV RUBAINE** and **CAPT ARTUZ** provided deliberately false or

misleading information for the express purpose of creating the impression that a

conspiracy to escape existed and Plaintiff posed a threat to the safety and security of

the facility.  **INV RUBAINE** and **CAPT ARTUZ** knew that no such conspiracy existed.

40

245. **INV RUBAINE** and **CAPT ARTUZ** fabricated the non-existent escape conspiracy as a means to punish Plaintiff for not cooperating in the investigation of **CO ILLA** and to coerce Plaintiff to assist them.

246. **CAPT DAYE** assisted **INV RUBAINE** and **CAPT ARTUZ** by deeming their testimony confidential when, in fact, no reason to deem the testimony confidential existed. **CAPT DAYE** deemed the testimony confidential to prevent Plaintiff from hearing the false or misleading testimony and revealing it as untrue.

247. Upon information and belief, **CAPT DAYE** knew that the information provided by **INV RUBAINE** and **CAPT ARTUZ** was untrue or misleading.

248. **CAPT DAYE** falsely concluded that Plaintiff posed a risk to the population and safety of the facility due to a conspiracy to escape. Upon information and belief, this purported conspiracy to escape involved **CO ILLA**.

249. **CAPT DAYE** knew **CO ILLA** was suspended and not allowed access to the facility at the time of **CAPT DAYE**'s decision.

250. On or about April 13, 2016, **SUP'T KAPLAN** nominally conducted a "60-day review" of Plaintiff's Administrative Segregation.

251. **SUP'T KAPLAN** did not conduct any meaningful review and knew there was no justification for Plaintiff's continued confinement in administrative segregation.

252. **SUP'T KAPLAN** knew that Plaintiff posed no danger to the safety or security of the facility and was not a threat of escape.

253.     **SUP'T KAPLAN** kept Plaintiff in Administrative Segregation status in retaliation for Plaintiff's refusal to cooperate with the investigation of **CO ILLA** and to coerce Plaintiff to cooperate in the investigation.

254.     Upon information and belief, **DIR RODRIGUEZ** did not conduct a meaningful review of the hearing which placed Plaintiff into administrative segregation.

255.     On or about June 10, 2016, **INV BROOMER** visited Plaintiff in the SHU and informed Plaintiff that if Plaintiff cooperated with the investigation of **CO ILLA**, **INV BROOMER** would work to get Plaintiff removed from SHU.

256.     **INV BROOMER** knew that Plaintiff was put into in administrative segregation as a plan to coerce Plaintiff to cooperate in the investigation of **CO ILLA**.

257.     **INV NUNEZ**, **INV RUBAINE**, and **INV BROOMER** each communicated to Plaintiff that she would be released from administrative segregation if she would cooperate with the investigation against **CO ILLA**.

258.     Plaintiff spent nearly eight months in solitary confinement.

259.     This time spent in isolation has severely damaged Plaintiff's physical and mental health.

260.     Shortly after Plaintiff's agreement to cooperate with the investigation, the administrative segregation determination was reversed and expunged from her record.

261.     **DIR RODRIGUEZ**, **SUP'T KAPLAN**, **CAPT DAYE**, **CAPT ARTUZ**, **INV BROOMER**, **INV NUNEZ**, and **INV RUBAINE** each knew that Plaintiff did not pose a threat to BHCF security.

262.     **DIR RODRIGUEZ**, **SUP'T KAPLAN**, **CAPT DAYE**, **CAPT ARTUZ**, **INV BROOMER**, **INV NUNEZ**, and **INV RUBAINE** aided and abetted each other's actions to confine Plaintiff in administrative segregation for improper reasons.

263.     The actions of **DIR RODRIGUEZ**, **SUP'T KAPLAN**, **CAPT ARTUZ**, **CAPT DAYE**, **INV BROOMER**, **INV NUNEZ** and **INV RUBAINE** deprived Plaintiff of her Due Process rights by confining her to isolated detention as a pretext for coercing information from her.

## SIXTH CAUSE OF ACTION

### DELIBERATE INDIFFERENCE
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (Against CO ALI)

264.     Paragraphs 1 – 263 are hereby incorporated and realleged.

265.     **CO ALI** knew that allowing K.W. into the yard with Plaintiff posed a significant and imminent threat of danger to Plaintiff.

266.     **CO ALI** intentionally allowed K.W. into the yard with Plaintiff.

267.     As a direct result of the deliberate actions and inaction by **CO ALI**, Plaintiff suffered severe physical and psychological injuries.

## SEVENTH CAUSE OF ACTION

### RETALIATION
### VIOLATION OF U.S. CONSTITUTION AMENDMENT I
### (Against CO ALI)

268.     Paragraphs 1 – 267 are hereby incorporated and realleged.

269.     **CO ALI** knew that Plaintiff had cooperated with OSI investigators and may seek remedy in the courts for the sexual abuse by **CO ILLA**.

270.     **CO ALI** allowed K.W. in the yard with Plaintiff to retaliate against Plaintiff for her cooperation of the investigation into **CO ILLA**, and to dissuade, intimidate and prevent Plaintiff from continuing to cooperate in the investigation and seeking remedy in the courts.

271.     As a direct result of the deliberate actions and inaction by **CO ALI**, Plaintiff suffered physical and psychological injuries as a result of the attack.

## EIGHTH CAUSE OF ACTION

### RETALITION
### VIOLATION OF U.S. CONSTITUTION AMENDMENT I
### (Against CO MOSS, CO DUKES, CO JOHN DOE #1,
### CO JOHN DOE #2, CO JANE DOE #1 and CO JANE DOE #2)

272.     Paragraphs 1-271 are hereby incorporated and reallaged.

273.     **CO MOSS** retaliated against Plaintiff for reporting **CO ILLA**'s sexual assault of Plaintiff.

274.     As a result of the retaliation, Plaintiff suffered severe psychological and emotional distress.

275.   By virtue of her retaliation against Plaintiff for her report of **CO ILLA**'s sexual assault, **CO MOSS** attempted to deprive Plaintiff of her right to freedom of speech in violation of her rights under the First Amendment of the United States Constitution.

276.   **CO DUKES**, **CO JOHN DOE #1**, **CO JOHN DOE #2**, **CO JANE DOE #1**, and **CO JANE DOE #2** aided and abetted **CO MOSS** by forming a circle around **CO MOSS** and Plaintiff.

## Prayer for Relief

WHEREFORE, Plaintiff prays for relief and demands judgment in her favor on each of her claims against defendants as follows:

a.   That a jury find and the Court adjudge and decree that Plaintiff shall recover compensatory damages in the sum of $10,000,000, plus punitive damages in the sum of $10,000,000, against the defendants in punitive damages, plus $1 against the defendants in nominal damages, jointly and severally, together with interest.

b.   That Plaintiff recover the costs of the suit herein, including reasonable attorneys fees pursuant to 42 U.S.C. § 1988.

c.   That Plaintiff be awarded such other and further relief as the Court shall deem just and proper.

## Jury Demand

Plaintiff hereby demands a trial by jury on all issues and counts in the Complaint herein.


Dated:        New York, New York
              July 30, 2018

                        Respectfully submitted,


                        By:  _____
                                Daniel A. McGuinness

                        LAW OFFICES OF DANIEL A. MCGUINNESS, PC
                        260 Madison Avenue, 17th Floor
                        New York, NY 10016
                        Tel: (212) 679-1990
                        Fax: (888) 697-0585
                        Email: dan@legalmcg.com


                                - and -



                        By:  _____/s/_____
                                Zachary Margulis-Ohnuma

                        LAW OFFICE OF ZACHARY MARGULIS-OHNUMA
                        260 Madison Avenue, Suite 1800
                        New York, New York 10016
                        Tel: (212) 685-0999
                        Fax: (212) 685-0922
                        Email: zach@zmolaw.com