UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

YEKATRINA PUSEPA,

                Plaintiff,

        v.

ANTHONY J. ANNUCCI, et al.

                Defendants.

17 Civ. 7954 (RA)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Law Office of Zachary Margulis-Ohnuma
Law Offices of Daniel McGuinness, PC
260 Madison Avenue, 17th Fl.
New York, NY
(212) 685-0999
zach@zmolaw.com

Attorneys for Defendant Yekatrina Pusepa

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ....................................................................................2

ARGUMENT ..............................................................................................................5

   I.  IN ORDER TO SURVIVE A MOTION TO DISMISS, A COMPLAINT MUST CONTAIN NOTHING MORE THAN A SHORT, PLAIN AND PLAUSIBLE STATEMENT OF THE CLAIM........................................................................5

  II.  THE COMPLAINT SUFFICIENTLY ALLEGES THAT ANNUCCI, EFFMAN AND KAPLAN KNEW PLAINTIFF WAS AT SUBSTANTIAL RISK OF HARM AND DID NOTHING TO STOP IT [ANSWERING DEFENDANTS' POINT I]. ..............................................................................7

     A.  Legal Standard for Supervisory Liability in a Claim of Deliberate Indifference to a Substantial Risk of Sexual Abuse ..................................7

     B.  Annucci, Effman and Kaplan are individually liable under the third and fifth prongs of the *Colon* test.....................................................................9

     C.  Annucci, Effman, and Kaplan, through their actions and failure to act, created policies and customs throughout DOCCS and BHCF that directly led to C.O. Illa's abuse of Plaintiff...............................................13

  III.  KAPLAN, NUNEZ, AND RUBAINE WERE DELIBERATELY INDIFFERENT TO THE SERIOUS RISK POSED BY C.O. ILLA WHEN THEY HELD PLAINTIFF OUT AS BAIT TO TRY TO CATCH HIM [ANSWERING DEFENDANTS' POINT II]...................................................15

  IV.  THE MOVING DEFENDANTS CONSPIRED TO VIOLATE AND VIOLATED PLAINTIFF'S DUE PROCESS RIGHTS BY FABRICATING EVIDENCE TO JUSTIFY PLACING HER IN SOLITARY CONFINEMENT [ANSWERING DEFENDANTS' POINT III]. ...............................................17

     A.  Daye, Artuz, and Rubaine denied Plaintiff due process by holding her in administrative segregation without meaningful hearing or review........17

     B.  The allegations supporting the conspiracy claim are not conclusory......22

C.  The conspiracy claim falls under an exception to the intracorporate conspiracy doctrine. ......................................................................................23

V.  THE COMPLAINT SUFFICIENTLY ALLEGES THAT C.O. ALI WAS DELIBERATELY INDIFFERENT TO PLAINTIFF'S SAFETY BY INTENTIONALLY ALLOWING HER TO BE ATTACKED BY ANOTHER INMATE [ANSWERING DEFENDANTS' POINT IV]..................................26

VI.  THE COMPLAINT SUFFICIENTLY ALLEGES THAT ALI, MOSS, AND DUKES RETALIATED AGAINST PLAINTIFF FOR ULTIMATELY COOPERATING AGAINST CO-DEFENDANT C.O. ILLA [ANSWERING DEFENDANTS' POINT V]...............................................................................28

A.  C.O. Ali .........................................................................................................28

B.  C.O. Moss and C.O. Dukes .........................................................................30

VII.  PLAINTIFF CONCEDES THAT THE COMPLAINT SHOULD BE DISMISSED AS AGAINST DEFENDANT SPEIGHTS................................31

VIII.  QUALIFIED IMMUNITY DOES NOT PROTECT OFFICERS WHO DELIBERATELY PERMIT INMATES TO BE SEXUALLY ABUSED, FABRICATE EVIDENCE TO JUSTIFY PLACEMENT IN SOLITARY CONFINEMENT, AND RETALIATE AGAINST INMATES WHO REPORT ABUSE [ANSWERING DEFENDANTS' POINT VI]...................................32

CONCLUSION.........................................................................................................33

# TABLE OF AUTHORITIES

## Cases

*Albritton v. Morris*,
No. 13 Civ. 3708 (KMK), 2016 U.S. Dist. LEXIS at 42561
(S.D.N.Y. Mar. 30, 2016) .............................................................................. 20, 30

*Alvarez v. City of New York*,
2012 U.S. Dist. LEXIS 176840 (S.D.N.Y. Dec. 12, 2012) ................................. 25

*Amaya v. Ballyschear LLC*,
295 F. Supp. 3d 204 (E.D.N.Y. 2018) .................................................................. 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................... passim

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 16

*Bussey v. Phillips*,
419 F. Supp. 2d 569 (S.D.N.Y. 2006) ................................................................ 22

*Carpenter v. Apple*,
No. 15 Civ. 1269 (GTS) (CFH), 2017 U.S. Dist. LEXIS 143296
(N.D.N.Y. Sept. 5, 2017) .................................................................................. 11

*Cash v. County of Erie*,
654 F.3d 324 (2d Cir. 2011) ................................................................. 10- 11, 13

*Colon v. Coughlin*,
58 F.3d 865 (2d Cir. 1995) ................................................................. 8-9, 11-12

*Cornejo v. Bell*,
592 F.3d 121 (2d Cir. 2010) .............................................................................. 7

*Delgado v. Bezio*,
No. 09 Civ. 6899 (LTS), 2011 U.S. Dist. LEXIS 51917
(S.D.N.Y. May 9, 2011) .................................................................................... 20

*Doe v. Kaplan,*
    No. 16 Civ. 9879 (NSR), 2018 U.S. Dist. LEXIS 47954
    (S.D.N.Y. Mar. 22, 2018)................................................................8, 12

*Dwares v. City of New York,*
    985 F.2d 94 (2d Cir. 1993) ...............................................................6

*Estate of Morris v. Dapolito,*
    297 F. Supp. 2d 680 (S.D.N.Y. 2004) .............................................6

*Farmer v. Brennan,*
    511 U.S. 825, 828 (1994) ...........................................................7, 32

*Giakoumelos v. Coughlin,*
    88 F.3d 56, 61 (2d Cir. 1996) .........................................................19

*Harris v. City of Newburgh,*
    No. 16-CV-2731 (KMK), 2017 U.S. Dist. LEXIS 159561
    (S.D.N.Y. Sep. 27, 2017)................................................................25

*Hewitt v. Helms,*
    459 U.S. 460 (1983) .......................................................................18

*Hill v. City of New York,*
    No. 03 CV 1283 (ARR), 2005 U.S. Dist. LEXIS 38926
    (E.D.N.Y. Dec. 29, 2005) ...............................................................25

*In re Polyurethane Foam Antitrust Litig.,*
    799 F. Supp. 2d 777 (N.D. Ohio 2011).........................................16

*Kalwasinski v. Morse,*
    201 F.3d 103 (2d Cir. 1999) ..........................................................18

*Kassner v. 2nd Ave. Delicatessen, Inc.,*
    496 F.3d 229 (2d Cir. 2007) .............................................................6

*Liner v. Fischer,*
    No 11 Civ. 6711 (PAC) (JLC), 2013 U.S. Dist. LEXIS 88147
    (S.D.N.Y. June 24, 2013)..................................................................8

*Luna v. Pico,*
    356 F.3d 481 (2d Cir. 2004....................................................18, 32

*Lunney v. Brureton,*
No. 04 Civ. 2438 (LAK) (GWG), 2007 U.S. Dist. LEXIS 38660
(S.D.N.Y. May 25, 2007) ....................................................................31

*Manley v. Grossman,*
No. 13 Civ. 1974 (KMK), 2017 U.S. Dist. LEXIS 159620
(S.D.N.Y. 2017)..................................................................................8

*Marom v. City of New York,*
No. 15 Civ. 2017 (PKC), 2016 U.S. Dist. LEXIS 28466
(S.D.N.Y. Mar. 7, 2016).....................................................................27

*Marshall v. Annucci,*
No. 16 Civ. 8622 (NSR), 2018 U.S. Dist. LEXIS 47534
(S.D.N.Y. Mar. 22, 2018)......................................................................8

*Matteo v. Perez,*
No. 16 Civ. 1837 (NSR), 2017 U.S. Dist. Lexis 152427
(S.D.N.Y. Sep. 19, 2017)....................................................................29

*Medina v. Hunt,*
No. 05 Civ. 1460 (DNH) (GHL), 2008 U.S. Dist. LEXIS 120759
(N.D.N.Y. Sep. 2, 2008)......................................................................25

*Munoz-Nagel v. Guess, Inc.,*
No. 12 Civ. 1312 (ER), 2013 U.S. Dist. LEXIS 61710
(S.D.N.Y. Apr. 30, 2013) ...................................................................26

*Ostrer v. Aronwald,*
567 F.2d 551 (2d Cir. 1977) ................................................................6

*Padavan v. United States,*
82 F.3d 23, 26 (2d Cir. 1996) ..............................................................6

*Pangburn v. Culbertson,*
200 F.3d 65 (2d Cir. 1999) .................................................................23

*Parris v. New York State Dep't Corr. Servs.,*
947 F. Supp. 2d 354 (S.D.N.Y. 2013)..................................................27

*Phillip v. Schriro,*
No. 12 Civ. 8349 (RA), 2014 U.S. Dist. LEXIS 117720
(S.D.N.Y. Aug. 22, 2014 ......................................................................8

*Roundtree v. City of New York,*
No. 15 Civ. 8198 (WHP), 2018 US Dist. LEXIS 51919
(S.D.N.Y. Mar. 27, 2018) ........................................................................ 30

*Samuels v. Fischer,*
168 F. Supp. 3d 625 (S.D.N.Y. 2016 .......................................... 9

*Sira v. Morton,*
380 F.3d 57 (2d Cir. 2004) ............................................................ 19

*Spavone v. N.Y. State Dep't of Corr. Servs.,*
719 F.3d 127 (2d Cir. 2013) .......................................................... 7

*Taylor v. Rodriguez,*
238 F.3d 188 (2d Cir. 2001) ..................................................... 18-19

*Vazquez-Mentado v. Buitron,*
995 F. Supp. 2d 93 (N.D.N.Y. 2014) ............................................ 8

*Veeco Instruments, Inc. v. Braun,*
434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) .................................. 22

*Zappulla v. Fischer,*
No. 11 Civ. 6733 (JMF), 2013 U.S. Dist. LEXIS 49728
(S.D.N.Y. Apr. 5, 2013) .................................................................. 8

## Statutes

42 U.S.C. § 1983 .............................................................................. 7, 22

Fed. R. Civ. P. 8(a)(2) ...................................................................... 2, 6

# INTRODUCTION

Yekatrina Pusepa is a 28-year-old inmate at Bedford Hills Correctional Facility who was sexually abused by a guard. Moving Defendants are four partially-overlapping groups of prison officials who are alleged to have caused harm to Ms. Pusepa during her incarceration. The first group, which includes the superintendent of Bedford Hills Correctional Facility ("BHCF") and her superiors at the New York State Department of Corrections and Community Supervision ("DOCCS"), deliberately created conditions in which the sexual abuse of female inmates was commonplace, leading directly to the assault on Ms. Pusepa. *See* Second Amended Complaint, ECF No. 54 (hereinafter "Complaint" or "Compl.") ¶¶ 215-219.

The second group, which also includes the superintendent and two DOCCS investigators, plotted to hold Ms. Pusepa out as bait after they specifically learned she was in an inappropriate relationship with the assailant, C.O. Ruben Illa, who has not yet responded to the Complaint. Compl. ¶¶ 220-224. The third group of Moving Defendants, which also includes the superintendent, are officials from DOCCS and the Attorney General's office who conspired to and did deny Ms. Pusepa due process by holding her in solitary confinement for eight months as a means to force her to cooperate with their investigation. Compl. ¶¶ 225-263.

Finally, the fourth group of Moving Defendants consists of corrections officers who deliberately put Ms. Pusepa in harm's way in order to punish her

for what they saw as voluntarily engaging in a relationship with C.O. Illa, and, separately, for ultimately revealing that relationship to investigators. Compl. ¶¶ 264-276. All Moving Defendants take the position that the 46-page Second Amended Complaint is too conclusory and implausible to satisfy the notice pleading requirements of the Federal Rules of Criminal Procedure. Fed. R. Civ. P. 8(a)(2). In fact, however, the Complaint is amply detailed and legally sufficient. The case should move to discovery without further delay.

## FACTUAL BACKGROUND

The facts are set forth in full in the Complaint, which are presumed to be true for purposes of this motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure. More detailed relevant facts drawn from the Complaint are set forth *infra* in the respective Argument sections. In brief, plaintiff Yekatrina Pusepa was an inmate at BHCF when defendant Ruben Illa, a corrections officer with custody over her, engaged her in an inappropriate personal relationship that led to one episode of sexual abuse. Compl. ¶¶ 19-26 (describing relationship and actions taken in furtherance of relationship). The inappropriate relationship began sometime before November 2014. Compl. ¶ 20.

In April 2015, CO Illa sexually abused Plaintiff in her cell, including touching her vagina for approximately one minute. Compl. ¶¶ 36-41. He later attempted to have intercourse with her in a storage room again in August 2015. Compl. ¶ 44. The relationship ended in December 2015, when CO Illa

tried to have plaintiff brought to him at the medical clinic in order to spend time with her. Compl. ¶¶ 45-47.

Prison officials—including Moving Defendants—were aware of the relationship as it was taking place and took no action to protect plaintiff from C.O. Illa. In fact, defendant investigator Rubaine told plaintiff that he "and others" knew about the relationship as of January 2015, months before the illegal sexual contact. Compl. ¶ 89. The other Moving Defendants failed to act against C.O. Illa because they hoped to catch him involved in illegal sexual activity. Compl. ¶ 90. Rather than protect Plaintiff from a known risk of harm, they used her as bait without her knowledge or consent. *Id.* Moreover, Moving Defendants Annucci, Effman and Kaplan were on notice that sexual abuse of inmates was a pervasive problem at female-inmate DOCCS facilities generally, and BHCF specifically, and they failed to take basic steps to prevent either the abuse itself or retaliation against victims of abuse by guards. *See* Compl. ¶¶ 156-209. Among other things, these defendants knew of at least seven criminal actions against BHCF guards for sexual abuse of inmates between 2009 and 2015. Compl. ¶ 166. Nonetheless, they allowed male guards to oversee female inmates alone, at night, without supervision.

After the assault, defendants Rubaine, Artuz, Daye, Kaplan, Nunez and Broomer plotted to coerce Plaintiff into speaking to them, and to punish her for engaging in the relationship by locking her down in solitary confinement for 23 hours a day. Compl. ¶¶ 45-117. Rubaine brazenly threatened to "make

her time harder" if Plaintiff did not cooperate with the investigation. Compl. ¶ 55. When she refused, she was escorted to the Special Housing Unit ("SHU"), where inmates are held in solitary confinement. Compl. ¶¶ 56-57. In order to justify her continued detention in SHU and loss of privileges, and to cover up their coercive action, defendants Rubaine, Artuz and Daye fabricated evidence that she was involved in an escape attempt, and ordered her to SHU confinement, knowing that no evidence existed to justify placing her there. Compl. ¶¶ 64-82. Defendants Rodriguez, Nunez and Kaplan extended Plaintiff's detention in SHU knowing that no evidence existed to hold her there. Coml. ¶¶ 84-103. The defendants released Plaintiff from SHU only after she relented and cooperated with them. Compl. ¶¶ 104-109.

While she was in SHU and shortly after, Plaintiff suffered two additional acts of retaliation by Bedford Hills staff. First, C.O. Ali purposely sent her to outdoor recreation with a known violent inmate who had previously threatened her. Compl. ¶¶ 118-138. C.O. Ali was aware that the inmate had previously threatened Plaintiff, that Plaintiff had reported the threat, and that there was a notation in the SHU logbook dated June 6, 2016 indicating that Plaintiff was to "REC ALONE". Compl. ¶¶ 118-126. Nonetheless, on June 9, 2016, C.O. Ali deliberately allowed the violent inmate into the yard when Plaintiff was there. Compl. ¶ 131. The inmate attacked Plaintiff, injuring her face, head, neck and arm, and sending her to the infirmary. Compl. ¶ 132-134.

About a month later, in the recreation yard, C.O. Moss approached Plaintiff stating, "this is the bitch messing with C.O. Illa." Compl. ¶ 140. A fellow inmate reported the statement to defendant Sgt. Speights, who did nothing. Compl. ¶¶ 141-142. C.O. Moss continued to follow Plaintiff around the yard and yell obscenities at her. Compl. ¶ 143. Later, C.O. Moss again turned off her body camera, approached within inches of Plaintiff's face, repeatedly punched her hand with her fist, and said "I say what I wanna say. We can do this anywhere." Compl. ¶ 146. As C.O. Moss was saying this, a group of correction officers formed around Plaintiff, including C.O. Dukes and several unidentified officers. Compl. ¶ 147. Plaintiff was rescued by another inmate, the same inmate who had reported C.O. Moss's statement earlier that day. Compl. ¶ 151.

<u>ARGUMENT</u>

## I.  In Order to Survive a Motion To Dismiss, a Complaint Must Contain Nothing More than a Short, Plain and Plausible Statement of the Claim.

Moving Defendants' central argument, repeated throughout their papers, is that the 46-page Complaint is too "conclusory" to show that the defendants violated Ms. Pusepa's constitutional rights. But their argument is premised on a demand for proof that is not required at this stage. A complaint need only contain a "short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). Conclusory allegations are those that "fail to give notice of basic events and circumstances of which the plaintiff complains . . . ." *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 685 (S.D.N.Y. 2004). Allegations of conspiracy

are not conclusory if the plaintiff "make[s] an effort to provide some details of time and place and the alleged effect of the conspiracy" and the complaint is "amplified by specific instances of misconduct." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) (internal quotations omitted) (quoting 2A Moore's Federal Practice P 8.17[6], at 8-109 to 8-110 (2d ed. 1992) and *Ostrer v. Aronwald*, 567 F.2d 551, 552 (2d Cir. 1977)).

In considering a motion to dismiss, the court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of plaintiff. *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). "This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se*." *See Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Padavan v. United States*, 82 F.3d 23, 26 (2d Cir. 1996).

A claim must be "plausible on its face," to survive a motion to dismiss, meaning "more than an unadorned, the-defendant-unlawfully-harmed-me accusation[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, plausibility is something less than a "probability requirement[.]" *Id.* Rather, a claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* Far more than that has been pled here with respect to each and every claim against each and every defendant.

II. **The Complaint sufficiently alleges that Annucci, Effman and Kaplan knew Plaintiff was at substantial risk of harm and did nothing to stop it [Answering Defendants' Point I].**

A. **Legal Standard for Supervisory Liability in a Claim of Deliberate Indifference to a Substantial Risk of Sexual Abuse**

To state a valid cause of action under 42 U.S.C. § 1983, plaintiff must plead two essential elements: (1) the defendants acted under color of state law; and (2) as a result of the defendants' actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges. *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). A prison official who is deliberately indifferent to a substantial risk of serious harm to an inmate violates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Sexual abuse of an inmate constitutes "serious harm" and violates the Eighth Amendment. *Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015) (citing *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997)).

Supervisory liability for a § 1983 violation requires personal involvement of the supervisor defendants in the violation of a plaintiff's rights. *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013). In *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), the Second Circuit explained that personal involvement can be demonstrated in any of five ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the

wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

While *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77(2009) narrowed the concept of "supervisory liability" for certain causes of action, this Court has previously adhered to the majority view of district courts in this Circuit that all five prongs of *Colon* remain good law. *See Phillip v. Schriro*, No. 12 Civ. 8349 (RA), 2014 U.S. Dist. LEXIS 117720, at *10-13 (S.D.N.Y. Aug. 22, 2014) (citing *Vazquez-Mentado v. Buitron*, 995 F. Supp. 2d 93 (N.D.N.Y. 2014); *Zappulla v. Fischer*, No. 11 Civ. 6733 (JMF), 2013 U.S. Dist. LEXIS 49728, at *9 (S.D.N.Y. Apr. 5, 2013); *Liner v. Fischer*, No 11 Civ. 6711 (PAC) (JLC), 2013 U.S. Dist. LEXIS 88147, at *7-8 (S.D.N.Y. June 24, 2013)). This continues to be the majority view. *See Doe v. Kaplan*, No. 16 Civ. 9879 (NSR), 2018 U.S. Dist. LEXIS 47954, at *5-6 (S.D.N.Y. Mar. 22, 2018); *Marshall v. Annucci*, No. 16 Civ. 8622 (NSR), 2018 U.S. Dist. LEXIS 47534, at *27-28 (S.D.N.Y. Mar. 22, 2018); *Amaya v. Ballyschear LLC*, 295 F. Supp. 3d 204, 225 (E.D.N.Y. 2018); *Manley v. Grossman*, No. 13 Civ. 1974 (KMK), 2017 U.S. Dist. LEXIS 159620, at *35-36 (S.D.N.Y. 2017).

### B.    Annucci, Effman and Kaplan are individually liable under the third and fifth prongs of the *Colon* test.

The Complaint sufficiently alleges that defendants Annucci, Effman, and Kaplan, by their individual acts and failures to act, were deliberately indifferent to the unconstitutional sexual abuse suffered by Plaintiff. Specifically, the factual allegations demonstrate their liability under the third and fifth *Colon* prongs.

Annucci, Effman, and Kaplan personally created and oversaw policies and customs that created and continued a culture of sexual abuse at BHCF. Despite being aware of the dangers inherent in permitting male officers to guard female inmates, Compl. ¶¶ 159-162, and the history of previous episodes of sexual abuse at BHCF, Compl., ¶¶ 166-168, they failed to create policies to protect female inmates.

Defendants' repeated reliance on the district court case *Samuels v. Fischer*, 168 F. Supp. 3d 625 (S.D.N.Y. 2016) is misplaced. *Samuels* addressed supervisory liability for an excessive force claim. It held that allegations that an official was sent reports of wrongdoing does not *alone* sustain a claim of supervisory liability. *Id.* at 637. The *Samuels* court cites a number of cases where the mere reporting of general incidents did not give rise to an inference that supervisory defendants had actual notice of a particular risk. *Id. Samuels* is not controlling, and its reasoning does not extend to this case. It strains credulity to suggest that the multiple criminal cases against BHCF officers for rape were either so routine or unimportant that they did not come to the

actual attention of Annucci, Effman, and Kaplan, and thereby alert them to a particular risk of harm to female inmates supervised, alone, by male guards.

The Second Circuit's decision in *Cash v. County of Erie*, 654 F.3d 324, 335-39 (2d Cir. 2011) offers guidance on the present allegations. *Cash* addressed a district court's ruling for defendants as a matter of law following a jury verdict finding deliberate indifference by the policy-maker defendant, Sheriff Gallivan. *Id.* The plaintiff had suffered sexual abuse by staff while incarcerated and alleged that Sheriff Gallivan demonstrated deliberate indifference by failing to enact policies prohibiting staff from unmonitored one-on-one contact with inmates. *Id.* The trial evidence revealed that Sheriff Gallivan was aware of *only one* complaint of sexual misconduct that had taken place in his facility, nearly four years prior to the plaintiff's abuse. *Id.* at 329. Sheriff Gallivan was also aware of other "highly publicized incidents" of sexual abuse at other New York correctional facilitates, which led to a one-page "no contact" policy memo directing staff that sexual contact with inmates was prohibited. *Id.* at 330. In reversing the lower court, and upholding the jury verdict against the Sheriff, the Second Circuit observed that the failure to enact policies safeguarding female inmates from sexual abuse by male guards (*e.g.*, prohibiting unmonitored one-on-one interactions) was sufficient to sustain liability against the policy maker:

> [T]he jury reasonably could have found that defendants knew, by virtue of New York state law, that female prisoners in their custody faced a risk of sexual abuse by male guards; that, by 1999, defendants also knew that a policy simply proscribing all sexual

contact between male guards and female prisoners was insufficient to deter such conduct at [the facility]; and that, in these circumstances, defendants' mere reiteration of the proscriptive policy unaccompanied by any proactive steps to minimize the opportunity for exploitation, as for example by prohibiting unmonitored one-on-one interactions between guards and prisoners, demonstrated deliberate indifference to defendants' affirmative duty to protect prisoners from sexual exploitation.

*Id.* at 339.

Applying *Cash*, district courts have found plausible claims of supervisory liability where prison officials who were aware of prior sexual abuse of female inmates by staff in the facility failed to take steps to implement policies to protect prisoners. In *Carpenter v. Apple*, No. 15 Civ. 1269 (GTS) (CFH), 2017 U.S. Dist. LEXIS 143296, at *27-37 (N.D.N.Y. Sept. 5, 2017), the plaintiff, Carpenter, filed suit after being sexually assaulted by a male staff member while being held as an inmate at the Albany County Correctional Facility.  The plaintiff alleged *inter alia* that the supervisory defendant, Sherriff Apple, was liable for his deliberate indifference to the risk of sexual abuse in the facility. *Id.* at **15-17. The court denied Sherriff Apple's motion to dismiss, holding that Carpenter had sufficiently pled allegations against him under the third and fifth prongs of *Colon.  Id.* at **31-37. Critical to the court's determination was that Sherriff Apple knew of prior instances of staff-on-inmate sexual assault in the facility and had "failed to adopt policies and procedures regarding circumstances where male corrections officers are permitted to be alone with female inmates." *Id.* at **32-33.

In *Doe v. Kaplan*, No. 16 Civ. 9870 (NSR), 2018 U.S. Dist. LEXIS 47954 at *16-17 (S.D.N.Y. Mar. 22, 2018), Moving Defendant Kaplan faced a similar allegation of deliberate indifference related to another sexual assault by a staff member upon an inmate at BHCF in 2015. Upon considering the number of criminal matters arising from BHCF staff-on-inmate sexual abuse prior to the incident of the plaintiff's abuse, the court found that the plaintiff had properly alleged that the conduct of Kaplan—the same defendant here—fell within the third prong of *Colon*:

> [I]t is plausible that [Sup't Kaplan]… would have been notified of the five prior instances of convictions and/or charges of 3rd degree rape of Bedford corrections officers between 2009 and 2015… and would have been responsible for deciding how to change Bedford's policies and procedures related to sexual conduct…

*Id.* at *16-17. Kaplan is alleged to have been aware of the same five instances prior to the abuse in this matter also. *See* Compl. ¶ 166. As such, the Complaint in this matter similarly states a valid cause of action.

Further, it is a reasonable inference that the other supervisory defendants, Annucci and Effman, would have been notified by, *inter alia*, the five prior instances of convictions or charges of rape by BHCF officers in the years preceding Plaintiff's abuse, the pending class action lawsuit, the high inmate rate of conception, and the numerous individual inmate grievances. Compl. ¶¶ 164-169. That notice, combined with the highest reported rate of staff-on-inmate sexual abuse rates in the nation, Compl. ¶ 164, and dozens of yearly sexual abuse investigations within the three female facilities, Compl. ¶

165, should have prompted Annucci and Effman to promote policies to reduce instances of staff-on-inmate sexual abuse. As discussed above, the Second Circuit has found that even a single instance of prior abuse can impose a duty to enact corrective policies in a correctional setting. *See Cash, supra.*

### C. Annucci, Effman, and Kaplan, through their actions and failure to act, created policies and customs throughout DOCCS and BHCF that directly led to C.O. Illa's abuse of Plaintiff.

Nearly 16 years and countless victims after *Cash*, defendants Annucci, Effman, and Kaplan failed to enact policies to protect prisoners from sexual exploitation at the hands of staff. Defendants assert that Plaintiff does not "tie any of these policies to the alleged sex abuse incident." Mot. to Dismiss 9. This ignores much of the Complaint. The Complaint repeatedly links administrators' failures to act directly to C.O. Illa's misconduct.

Annucci, Effman, and Kaplan failed to enact rules and policies to monitor and discipline staff who engaged in behavior that constituted warning signs of sexual abuse, such as spending a disproportionate amount of time with a prisoner, engaging in personal discussions, or swapping shifts to work near an inmate. Compl. ¶¶ 182, 184-186. The failure to prevent such conduct allowed C.O. Illa to develop his improper personal relationship with Plaintiff in full view of BHCF staff without fear that he would be reported or disciplined. Compl. ¶¶ 21-25 (C.O. Illa would engage in long personal conversations with Plaintiff in front of other officers and supervisors). C.O. Illa was permitted to swap shifts with other officers to spend additional time

with Plaintiff. Compl. ¶¶ 30, 43. CO Illa frequently left his assigned work area to spend time with Plaintiff. Compl. ¶ 189. He was never reported, disciplined or reprimanded for leaving his post, because it was the custom and policy of BHCF for guards to freely move about the facility without regard to work assignment. Compl. ¶ 187.

Most importantly, Annucci, Effman, and Kaplan failed to implement policies that prevented prolonged, unmonitored one-on-one contact between male staff and female inmates. Annucci, Effman, and Kaplan failed to enact policies to supervise male officers left alone with female inmates. Their failure predictably led to the abuse in this case.

A dorm occupied by approximately 75 female inmates was often guarded by a single male correction officer. Compl. ¶¶ 31, 33. C.O. Illa was free to manipulate Plaintiff into an inappropriate relationship without worrying that a supervisor would catch him in the act. He knew that, although half a dozen of his colleagues faced jail for sexual abuse of female prisoners, his supervisors would only stop by his post at scheduled times. Compl. ¶¶ 205-207. CO Illa knew that supervisory rounds would only be conducted around 9:00 a.m. and after 1:00 p.m. Compl. ¶ 208. Even at those times, a supervisor would merely check in, and not attempt to learn anything that happened during the time when Illa was alone with the female inmates. Compl. ¶ 204. Illa knew that because of this lack of supervision, during the

time between scheduled check-ins he could freely manipulate Plaintiff into an inappropriate relationship without fear of consequences. Compl. ¶ 209.

Annucci, Effman, and Kaplan also failed to require adequate monitoring by security cameras, which would have protected plaintiff from Illa. Compl. ¶¶ 194-200. This failure to provide monitoring by camera allowed C.O. Illa to take Plaintiff to known unmonitored areas to develop their relationship, manipulate her, and engage in inappropriate and illegal physical contact with her. Compl. ¶¶ 28-29, 201.

There can be no question that if the allegations in the complaint are true, Annucci, Effman, and Kaplan knew of the risks to female inmates at DOCCS facilities, and in particular to the women at BHCF, and, despite repeated of instances of abuse, failed to enact policies to prevent the abuse of Yekatrina Pusepa by C.O. Ruben Illa. C.O. Illa abused Plaintiff as a direct result of the administrators' failures. As such, Annucci, Effman, and Kaplan are liable for their deliberate indifference to Plaintiff's Eighth Amendment rights.

III. **Kaplan, Nunez, and Rubaine were deliberately indifferent to the serious risk posed by C.O. Illa when they held Plaintiff out as bait to try to catch him [Answering Defendants' Point II].**

Moving defendants Kaplan, Nunez and Rubaine argue that the Complaint does not properly state a claim against them for deliberate indifference to Plaintiff's safety that led to her assault by C.O. Illa because,

they submit, it contains too few facts to draw the conclusion that defendants were aware of the threat posed by Illa. Mot. 12-14. Not so.

The Complaint specifically alleges that in March of 2016, Rubaine told Plaintiff that he "and others" had known about C.O. Illa's inappropriate relationship with her since January 2015. Compl. ¶ 89. It is a reasonable inference from this statement that the "others" referred to by Rubaine were, at a minimum, Kaplan and Nunez. OSI Chief Investigator Nunez was Rubaine's supervisor and worked in tandem with Rubaine. Compl. ¶¶ 90-92. Kaplan may be presumed to have known because Plaintiff was transferred during this period, which must have been done under Kaplan's supervision. Compl. ¶ 42.

The mere fact that these defendants only had personal contact with Plaintiff after they permitted her to be assaulted does not suggest that they did not know about the danger posed by Illa before the assault took place. On the contrary, effectively speaking for the three of them, Rubaine specifically advised Plaintiff that they were aware of the relationship. And there is no suggestion by the defendants that they did anything to stop it. These allegations are not conclusory. *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 793 (N.D. Ohio 2011) (explaining that Supreme Court "define[s] as conclusory 'bare assertions' of liability, and 'threadbare' legal statements... but not allegations that contain factual support") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), and *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)). Rubaine later demonstrated his close communication with Kaplan regarding Plaintiff when he told Plaintiff that, after Plaintiff had cooperated with the investigation, Rubaine had spoken with Kaplan and they agreed to remove her from SHU. Compl. ¶ 108. Rubaine's statement combined with the extensive backdrop of sexual abuse at BHCF, Plaintiff's intra-facility transfer, and Rubaine's direct communication about Plaintiff with Nunez and Kaplan, constitutes "factual content that allows the court to draw the reasonable inference" (*Iqbal*, 556 U.S. at 678) that the "others" referred to by Rubaine include his supervisor and co-investigator Nunez, and the BHCF superintendent, Kaplan. The Complaint against them, therefore, should not be dismissed.

IV. **The Moving Defendants conspired to violate and violated Plaintiff's Due Process rights by fabricating evidence to justify placing her in solitary confinement [Answering Defendants' Point III].**

A. **Daye, Artuz, and Rubaine denied Plaintiff due process by holding her in administrative segregation without meaningful hearing or review.**

Plaintiff's due process rights were violated by holding her in solitary confinement, as "administrative segregation" or "ad seg," without any meaningful hearing or review. The ad seg determination was a thin pretext for the true reason for her confinement, which was to coerce her into cooperating with prison authorities. No evidence existed to justify confining Plaintiff by herself, 23 hours per day, in the prison's Special Housing Unit for eight months.

The due process afforded to an inmate in an ad seg hearing is limited to notice of charges, an opportunity to present her views on the charges, and a decision-maker's review of the charges and then-available evidence. *Hewitt v. Helms*, 459 U.S. 460, 476 (1983). "Although the hearing requirement for placement in administrative segregation may be met by an informal, non-adversary proceeding, it is a bedrock requirement of due process that such hearing be held at a meaningful time and in a meaningful manner." *Taylor v. Rodriguez*, 238 F.3d 188, 193 (2d Cir. 2001) (citations and quotations omitted). Due process requires that some "reliable evidence" supports the determination made at the hearing. *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004) (citing *Taylor*, at 194)). An inmate also has the right to a fair and impartial hearing officer. *See Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999).

Moving Defendants contend that the Complaint itself alleges that some reliable evidence existed for confining Plaintiff to SHU and point to (1) C.O. Illa's possession of a handcuff key, (2) the fact that C.O. Illa summoned Plaintiff to the medical clinic, and (3) confidential testimony regarding an alleged escape attempt. Mot. to Dismiss at 17 (citing Compl. ¶¶ 59, 64, 70-75). As to the first, it is impossible to discern why a correction officer's possession of a handcuff key– which presumably is necessary tool for performing the job– is evidence of anything other than C.O. Illa's working at the facility. Similarly, C.O. Illa's summoning of Plaintiff to the medical clinic is not evidence of anything other than, perhaps, his own desire to see her, and to continue

pursuing their improper relationship, which Rubaine and others knew had been going on for the past year.

The third piece of "evidence" defendants rely on is the alleged confidential statements. To support of finding based on confidential information, the Second Circuit has held that an informant's testimony will suffice where there has been some examination of indicia relevant to an informant's credibility. *Taylor*, *supra*, 238 F.3d at 194 (citing *Giakoumelos v. Coughlin*, 88 F.3d 56, 61 (2d Cir. 1996)). No such examination can be divined from the allegations in the Complaint. Discovery is necessary before the Court can rule on whether some reliable evidence truly existed for the initial hearing. The Second Circuit has also held that when confidential information is relied upon, "there is a particular due process interest in requiring some factual specificity in the misconduct notice." *Sira v. Morton*, 380 F.3d 57, 70 (2d Cir. 2004). No such factual specificity was provided to Plaintiff.

The "evidence" cited by defendants was simply a smokescreen for their true motive, which was to force Plaintiff to provide them with information about Illa. Rubaine threatened Plaintiff that he would "make her time harder" if she did not cooperate, and immediately had her transferred to solitary confinement when she refused. Compl. ¶¶ 55-56. Despite Artuz's claim that he had "evidence" supporting Plaintiff's SHU confinement, he knew that Plaintiff was not aware of any plan, conspiracy or attempt to escape from BHCF and that *no such plan existed*. Compl. ¶¶ 64, 65. Daye claims to have issued the

administrative segregation recommendation based on the "evidence" presented at the hearing, when no reliable evidence existed. Compl. ¶ 74. As such, Plaintiff has stated a plausible, valid claim against Daye, Artuz, and Rubaine for violating Plaintiff's due process rights and condemning Plaintiff to eight months' solitary confinement without any justification.

Moving defendants argue that the fact of Kaplan's review of Plaintiff's placement in SHU supports that Plaintiff was provided due process. Mot. to Dismiss at 17. They write "due process requires only some sort of periodic review of the initial ad seg placement." *Id*. This argument ignores the fact that Kaplan affirmed an unconstitutional disciplinary action.

A supervisor is liable for a violation of due process where she is personally involved in the violation of the plaintiff's due process rights, which can be established by the supervisor's affirmation of an allegedly unconstitutional disciplinary action. *See Albritton v. Morris*, No. 13 Civ. 3708 (KMK), 2016 U.S. Dist. LEXIS at 42561, at *55-56 (S.D.N.Y. Mar. 30, 2016) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement."); *Delgado v. Bezio*, No. 9 Civ. 6899 (LTS), 2011 U.S. Dist. LEXIS 51917, at *26 (S.D.N.Y. May 9, 2011) (finding personal involvement and thus deprivation of due process rights where supervisory personnel affirmed an unconstitutional disciplinary decision).

In the instant case, Kaplan not only affirmed the faulty ad seg hearing disposition, despite the lack of any reliable evidence, but also claimed to have

conducted a 60-day review of Plaintiff's administrative segregation and wrote Plaintiff a letter providing the results of the review. Compl. ¶ 97-98. The Complaint more than adequately alleges that Supt. Kaplan knew of the unconstitutional nature of the proceedings through her personal involvement– including her awareness of the improper relationship for a year prior to acting (*supra* III), and Rubaine stating that he spoke with her to release Plaintiff from ad seg after she cooperated with the investigation (Compl. ¶ 108)–and thus should survive the motion to dismiss.

Next, Moving Defendants Broomer, Nunez and Rodriguez argue that they are not responsible for the Due Process violation because "there are no factual allegations whatsoever tying them to the Ad Seg determination by DOCCS." Mot. at 18. Their subsequent activity makes clear, however, that they were each personally involved in denying Plaintiff her Due Process rights in order to coerce her into making a statement.

The claim is adequately pled against Broomer and Nunez because they acted in concert with Rubaine to coerce Plaintiff to speak against her will. Nunez visited plaintiff while she was in solitary confinement in March 2016 and told her that he would help her get out of solitary if she wrote out a statement against C.O. Illa. Compl. ¶¶ 91-92. Broomer visited Plaintiff alongside Rubaine while she was being held in solitary confinement on June 10, 2016, telling her that if she agreed to testify against Illa he would help her get out of solitary. Compl. ¶¶ 105, 255. She succumbed to the pressure that

day and wrote out an 11-page statement; Broomer apparently kept his word and facilitated her release a couple of weeks later. Compl. ¶¶ 106-108.

Finally, the Complaint adequately alleges personal involvement by Director Rodriguez because he personally reviewed and affirmed the hearing determination, even though he knew it contained no evidence supporting any finding against Plaintiff. Compl. ¶¶ 85-86.

### B. The allegations supporting the conspiracy claim are not conclusory.

To support a § 1983 claim of conspiracy, a plaintiff must demonstrate: "(1) an agreement between two or more state actors or a state actor and a private party, (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Bussey v. Phillips*, 419 F. Supp. 2d 569, 586 (S.D.N.Y. 2006). *See also Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). A plaintiff at the motion to dismiss stage is "entitled to all reasonable factual inferences that logically flow from the particularized facts alleged" in the complaint. *Veeco Instruments, Inc. v. Braun*, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006). Plaintiff's allegations state specific dates and circumstances to suggest a conspiracy among the relevant officers to deny her Eighth Amendment constitutional rights, which entitles her to relief in the form of damages.

Plaintiff was locked in a supply closet on December 2, 2015 after being summoned by C.O. Illa to the medical unit. Compl. ¶¶ 45, 52. Later that day,

immediately after refusing to cooperate with Rubaine, Plaintiff was placed in solitary confinement. Compl. ¶¶ 54-56. In a sham hearing, Rubaine, Artuz, and Daye acted together to affirm her continued solitary confinement. Compl. ¶ 82. Nunez then told Plaintiff that if she wrote a statement he would assist her release from solitary confinement. Compl. ¶ 92. Subsequently, both Rodriguez and Kaplan falsely claimed they had conducted a review of her solitary confinement, thereby extending her SHU confinement and allowing investigators to use it to coerce her cooperation. Compl. ¶¶ 86-87, 97-99. Broomer then told Plaintiff that she would be released from solitary confinement if she cooperated in the investigation, shortly after which her cooperation did result in her release on July 5, 2016. Compl. ¶¶ 105-09.

The Complaint alleges specific dates and circumstances in support of the conspiracy claim, and, as such, the claim is not conclusory.

### C. The conspiracy claim falls under an exception to the intracorporate conspiracy doctrine.

Moving Defendants argue that Plaintiff's Fourth Cause of Action is barred by the "intracorporate conspiracy doctrine." Motion to Dismiss at 19. Under this doctrine, "a plaintiff fails to state a conspiracy claim if the conspiratorial conduct challenged is essentially a single act by a single corporation or municipal entity acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Harris v. City of Newburgh*, No. 16 Civ. 2731 (KMK), 2017 U.S. Dist. LEXIS

159561, at *21 (S.D.N.Y. Sep. 27, 2017). An exception to this doctrine exists, however, where "plaintiff alleges facts that tend to show the defendants were pursuing personal interests wholly separate and apart from the entity." *Id*.

The Complaint alleges facts showing Moving Defendants were pursuing "personal" interest separate from those of their employer. Specifically, the Fourth Cause of Action alleges a conspiracy by the named individuals to "punish Plaintiff for her relationship with CO Illa" in a manner that violated her right to Due Process under the U.S. Constitution. Compl. ¶¶ 226-229, 240. In furtherance of this conspiracy, Plaintiff alleges that the named individuals "agreed to designate Plaintiff to administrative segregation as a pretext for SHU detention." Compl. ¶ 230. The conspirators pursued their unjust goal by using information they knew to be "false and fabricated" to conduct a sham hearing as a means of justifying Plaintiff's isolated confinement. Compl. ¶¶ 232-234. Further, the conspirators agreed not to conduct any "meaningful review" of Plaintiff's confinement, in violation of State policy, in order to hide the fact that that the purported justification for her confinement was based on false information and a sham hearing. Compl. at ¶¶ 235-241.

Courts in the Second Circuit have held that the "intracorporate conspiracy doctrine" is inapplicable, and that plaintiffs have sufficiently alleged defendants were pursuing interests separate and apart from the State, where defendants are alleged to have fabricated reports in furtherance of the conspiracy. *See Harris v. City of Newburgh*, No. 16-CV-2731 (KMK), 2017 U.S.

Dist. LEXIS 159561, at *22-24 (S.D.N.Y. Sep. 27, 2017) ("While report writing may be a core function of an officer's duties, writing *false* reports—which is what Plaintiff here alleges—most certainly is not"). Similarly, defendants' decision to deny Plaintiff any meaningful review of her ad seg determination suggest that defendants knew Plaintiff's isolated confinement was unjust, not in accordance with the interests of the State, and that defendants needed to hide the scheme from their superiors. *See Medina v. Hunt*, No. 05 Civ. 1460 (DNH) (GHL), 2008 U.S. Dist. LEXIS 120759, at *58-59 (N.D.N.Y. Sep. 2, 2008) (allegation that defendants took precautions to avoid detection and "continued to use force against Plaintiff even when Plaintiff was in mechanical restraints and was no longer resisting" suggest that defendants "were not acting, and knew they were not acting, in the interest of DOCS but were acting in their own interests"); *Hill v. City of New York*, No. 03 CV 1283 (ARR), 2005 U.S. Dist. LEXIS 38926, at *19-20 (E.D.N.Y. Dec. 29, 2005) (Plaintiff "clearly alleges that defendant Barrett acted in his own personal interest, not in the interest of the police department or the city, by conspiring with others to cover-up his alleged use of excessive force."); *Alvarez v. City of New York*, 2012 U.S. Dist. LEXIS 176840, at *9 (S.D.N.Y. Dec. 12, 2012) (defendants pursuing personal interest where "complaint states that the defendants conspired falsely to accuse plaintiff . . . to shield themselves from liability, embarrassment, and charges of misconduct.").

Plaintiff has sufficiently alleged facts to suggest that defendants were pursuing interests separate and apart from the State, thus allowing her Fourth Cause of Action, conspiracy to violate her right to Due Process, to proceed.

**V.    The complaint sufficiently alleges that C.O. Ali was deliberately indifferent to Plaintiff's safety by intentionally allowing her to be attacked by another inmate [Answering Defendants' Point IV].**

Defendants argue that the Complaint does not contain sufficient factual allegations regarding C.O. Ali's knowledge of the threat K.W. posed to Plaintiff. Mot. to Dismiss at 19-20. In fact, the Complaint describes in detail how Ali violated DOCCS and PREA directives by openly discussing allegations that Plaintiff was sexually abused with other officers in front of inmates and ignored an order in the SHU logbook mandating Plaintiff "REC ALONE." Compl. ¶¶ 118, 126. Defendants claim that the allegations regarding Ali's knowledge are insufficient because they are made upon "information and belief." Mot. to Dismiss at 20. Despite the defendant's contention, the allegations are accompanied by "a statement of the facts upon which the belief is founded." *Munoz-Nagel v. Guess, Inc.*, No. 12 Civ. 1312 (ER), 2013 U.S. Dist. LEXIS 61710, at *11 (S.D.N.Y. Apr. 30, 2013). C.O. Ali knew that Plaintiff was in a relationship with C.O. Illa. Compl. ¶ 118. Against DOCCS and PREA directives, she openly discussed that relationship with other officers in front of inmates. Compl. ¶¶ 118, 122. As a result of C.O. Ali's and other correction officers' discussions of Plaintiff's protected conduct, K.W.

learned of Plaintiff's relationship with C.O. Illa and threatened to harm her. Compl. ¶¶ 120-22. Plaintiff reported the threat, and it was recorded in the SHU logbook that Plaintiff was to "REC ALONE." Compl. ¶ 126. Ali knew that K.W., who was in SHU for assaulting a staff member, was violent. Compl. ¶¶ 124, 130. Nevertheless, Ali allowed K.W. into the recreation yard with Plaintiff, where she immediately attacked and injured Plaintiff. Compl. ¶¶ 131-32.

These facts, all contained within the Complaint, support the conclusion that C.O. Ali knew K.W. posed a threat to Plaintiff and deliberately disregarded that threat when he allowed K.W. into the recreation yard with Plaintiff. *See Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013) ("For a plaintiff to state a claim for deliberate indifference based on a failure to protect him, he must allege that corrections officers knew of and disregarded a particular risk to his safety."). Here, Plaintiff has sufficiently alleged that Ali knew of the risk to Plaintiff's safety and deliberately disregarded it.

To the extent that Defendants seek to dispute that C.O. Ali lacked actual knowledge regarding K.W.'s violence or the risk she posed to Plaintiff, that is an issue of fact not properly presented on a motion to dismiss. *See Marom v. City of New York*, No. 15 Civ. 2017 (PKC), 2016 U.S. Dist. LEXIS 28466, *35 (S.D.N.Y. Mar. 7, 2016) (holding that plaintiffs are not required "to set forth a detailed account of the events surrounding their claims in order to

survive a motion to dismiss"). Plaintiff need only provide enough factual

content for the court to "draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff has pled sufficient facts to plausibly demonstrate that C.O. Ali was

deliberately indifferent to Plaintiff's safety, and the motion to dismiss should

be denied.

## VI. The Complaint sufficiently alleges that Ali, Moss, and Dukes retaliated against Plaintiff for ultimately cooperating against co-defendant C.O. Illa [Answering Defendants' Point V].

### A.     C.O. Ali

Defendants argue that the Complaint fails to sufficiently plead that

C.O. Ali knew that Plaintiff was cooperating with OSI against C.O. Illa and

had been placed in solitary confinement for initially failing to cooperate or

that he orchestrated the vicious beating (callously referred to as a "recreation

mishap" by Supervisory Defendants, Mot. to Dismiss at 21) because of

Plaintiff's cooperation.

Ali was fully aware of Plaintiff's relationship with Illa and of her

discussions with OSI. Confusingly, Defendants argue that Ali's statement to

Plaintiff, that she would have cooperated with OSI against Illa instead of

going to SHU, "can be interpreted to mean that he did not believe that there

was any cooperation" or that he "was [not] aware of plaintiff's interactions

with OSI." Mot. to Dismiss at 21. The opposite is true. Ali's statement proves

that he knew Plaintiff was speaking to OSI and that she had been placed in

solitary confinement for not initially cooperating in the investigation against Illa. Even accepting Defendants' contention that C.O. Ali's statement "can be interpreted" to have a different meaning than that apparent on its face, interpretations are issues of fact not appropriately presented on a motion to dismiss. Similarly, Defendants' claim that Plaintiff was placed in solitary confinement "for facility safety and security because of the escape attempt" directly contradicts the factual allegations in the Complaint. Compl. ¶¶ 45-117.

The Complaint also alleges sufficient facts to tie Ali's deliberate disregard for Plaintiff's safety to her cooperation with OSI investigators. As discussed, *supra* V, Ali not only knew about Plaintiff's relationship with Illa, but she also taunted Plaintiff about that relationship and openly discussed it with other officers. Compl. ¶ 118. K.W. overheard correction officers discussing the relationship and threatened Plaintiff because of it. Compl. ¶¶ 120-22. Despite knowing that K.W. had made threats against Plaintiff and that Plaintiff was mandated to "REC ALONE," Ali ignored that mandate and allowed K.W. to enter the recreation yard with Plaintiff. Compl. ¶¶ 129-31..

Given that Ali openly taunted Plaintiff about her relationship with CO Illa and her involvement with OSI, knew about K.W.'s violent nature, and violated the order for Plaintiff to "REC ALONE" by allowing K.W. into the recreation yard with Plaintiff, the Court can reasonably infer that Ali retaliated against Plaintiff for reporting her relationship with Illa. *See Matteo*

*v. Perez*, No. 16 Civ. 1837 (NSR), 2017 U.S. Dist. Lexis 152427, at *5 (S.D.N.Y. Sep. 19, 2017) ("Plaintiff has demonstrated a tangible connection between the acts of the defendant and the injuries suffered").

### B. C.O. Moss and C.O. Dukes

Defendants also argue that Plaintiff's retaliation claims against Moss and Dukes fail because their alleged conduct would not "deter an inmate of ordinary firmness" from reporting sexual misconduct. Mot. to Dismiss at 21.

Essentially, Defendants argue that an inmate would not be deterred from reporting by a correction officer calling her "a bitch," "following her around the yard and yelling obscenities into" her face, and turning off her bodycam before approaching within inches of her face while repeatedly punching a "hand into a closed fist indicating" an intention to strike her. Compl. ¶¶ 140, 143, 146. Moreover, instead of intervening on Plaintiff's behalf, C.O. Dukes and other officers formed a circle around C.O. Moss and Plaintiff to watch the confrontation. Compl. ¶ 147.

Moving Defendants argue, "the mere allegation of verbal abuse, however repugnant it may be, does not rise to the level of a constitutional violation and is not cognizable under section 1983." *Roundtree v. City of New York*, No. 15 Civ. 8198 (WHP), 2018 US Dist. LEXIS 51919, at *15 (S.D.N.Y. Mar. 27, 2018). But where the verbal abuse is accompanied by threats of violence, it may rise to the level of retaliation. *See Albritton v. Morris*, No. 13 Civ. 3708 (KMK), 2018 US Dist. LEXIS 53423, at *60 (S.D.N.Y. Mar. 29, 2018)

(verbal harassment in the prison context can support a retaliation claim if it consists of a 'threat' that is 'specific and 'direct'); *Lunney v. Brureton*, No. 04 Civ. 2438 (LAK) (GWG), 2007 U.S. Dist. LEXIS 38660, at *74-75 (S.D.N.Y. May 25, 2007) (collecting cases where threats support a claim of retaliation).  The Complaint alleges more than mere words—it alleges specific, physical threats of violence by C.O. Moss against Plaintiff, conduct that constitutes assault under New York common law. C.O. Moss turned off her body camera, approached within inches of Plaintiff, screamed at Plaintiff that they could "do this anywhere", and "repeatedly punched her hand with a closed fist indicating that she intended to strike Plaintiff."  Compl. ¶ 146.[1]

## VII. Plaintiff concedes that the Complaint should be dismissed as against defendant Speights.

C.O. Speights correctly points out that, although she is alleged to have failed to intervene to protect Plaintiff while CO Moss assaulted her, Compl. ¶ 149, she is not named in any cause of action. Accordingly, Plaintiff consents to dismissal as against Speights, but reserves the right to subpoena her for a third-party deposition.

---

[1] Defendants do not dispute that the Complaint properly alleges Moss' actions were done in retaliation of Plaintiff reporting her relationship with CO Illa.

**VIII. Qualified immunity does not protect officers who deliberately permit inmates to be sexually abused, fabricate evidence to justify placement in solitary confinement, and retaliate against inmates who report abuse [Answering Defendants' Point VI].**

Moving Defendants set forth the standards for qualified immunity, but point to no caselaw or other authority suggesting that defendants are entitled to qualified immunity under these circumstances. Mot. to Dismiss at 22-25. In particular, they do not challenge that the authorities cited above constituted "clearly established" law with respect to deliberate indifference to an inmate's safety, *see Farmer v. Brennan*, 511 U.S. 825 (1994), or due process for solitary confinement, *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004). They do not argue that investigators acted in an objectively reasonable fashion when they fabricated false evidence against Plaintiff, or confined Plaintiff to SHU without any evidence to support such a determination. *See* Mot. to Dismiss at 24-25 (arguing that investigating "while Plainiff was safely secured in a segregated housing [*sic*] did not violate the constitution" and that Captain Daye provided due process "far in excess of that mandated" even though he is alleged to have known that no evidence existed to justify solitary confinement and known that she did not pose a threat to security, Compl. ¶¶ 110, 239, 262). Tellingly, they do not even argue with any specificity that Defendants Annucci, Effman, Kaplan, Rubaine, and Nunez acted "reasonably" when they failed to protect Plaintiff from C.O. Illa. *See* Mot. to Dismiss 25. Nor could they: such an argument requires resolution of factual disputes regarding these defendants' knowledge and the steps they failed to take to protect Ms. Pusepa

from CO Illa. Accordingly, their motion should be denied and the case should proceed to discovery.

## CONCLUSION

Because each of the causes of action in the Complaint is specific, non-conclusory, legally valid, and plausible, the defendants' motion to dismiss should be DENIED.

Dated: New York, New York
        August 9, 2018

Respectfully submitted,

Law Office of Zachary Margulis-Ohnuma

By: *Zachary Margulis-Ohnuma*
Zachary Margulis-Ohnuma
260 Madison Avenue, 17th Fl.
New York, NY 10016
(212) 685-0999

Law Offices of Daniel McGuinness, PC

By: _____
Daniel A. McGuinness
260 Madison Avenue, 17th Fl.
New York, NY 10016
(212) 679-1990